(No. 78457

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. JOHN PECORARO, Appellant.

*Opinion filed February 6, 1997.—Rehearing denied March 31, 1997.*

298

Marshall J. Hartman, of Chicago, David J. Keefe, of Nashville, Tennessee, and Daniel R. Schwartz and Gregory Elsnic, law students, for appellant, and John Pecoraro, of Menard, appellant *pro se*.

James E. Ryan, Attorney General, of Springfield, and Jack O'Malley, State's Attorney, of Chicago (Arleen C. Anderson, Assistant Attorney General, of Chicago, and Renee Goldfarb and Kim A. Novi, Assistant State's Attorneys, of counsel), for the People.

JUSTICE NICKELS delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, defendant, John Pecoraro, was found guilty of murder (Ill. Rev. Stat. 1981, ch. 38, par. 9—1) in connection with the shooting death of Jimmy Christian. Thereafter a capital sentencing hearing was conducted before

the trial court and defendant was sentenced to death. Defendant's conviction and sentence were affirmed on direct appeal. *People v. Pecoraro*, 144 Ill. 2d 1 (1991). Defendant subsequently filed a petition for relief under the Post-Conviction Hearing Act. 725 ILCS 5/122—1 *et seq.* (West 1994). The State filed a motion to dismiss defendant's petition and the circuit court granted the motion. Defendant appeals directly to this court pursuant to Supreme Court Rule 651 (134 Ill. 2d R. 651). We note that defendant has filed briefs through counsel and has also submitted a *pro se* brief. For the reasons set forth we affirm the judgment of the circuit court.

## BACKGROUND

On Wednesday, December 8, 1982, the body of the victim, Jimmy Christian, was discovered in his brown Oldsmobile, which was parked near the premises of a small manufacturing company in Chicago. The owner and an employee of the company had observed that the Oldsmobile had been parked in the same spot and had not moved since Monday, December 6. The cause of the victim's death was a gunshot wound to the chest.

The record reveals that defendant worked with the victim's wife, Nadine Christian, for a company called Parklane Jewelry. The detectives investigating the murder apparently considered defendant a suspect and interviewed him in connection with the crime, but were initially unable to obtain sufficient evidence to support charges against defendant. The turning point in the case occurred several years after the offense. On August 6, 1986, at about 9 a.m., defendant flagged down a police car driven by Chicago police officer Jeffrey Becker. Defendant stated that he wanted to confess to a murder. Officer Becker placed defendant under arrest and administered his *Miranda* warnings. Defendant informed Officer Becker that he had killed Jimmy Christian. Defendant related that he waited outside the

victim's house. When the victim emerged, defendant forced the victim at gunpoint into the victim's automobile. Defendant drove to a certain location and shot the victim. Defendant indicated that the murder weapon was a .45-caliber handgun and that he disposed of the weapon in the Chicago River.

After Officer Becker transported defendant to the police station, defendant was interviewed by Detectives William Kaupert and Peter Aipaia and later by Assistant State's Attorney Joseph Barbaro. Before each interview, defendant was advised of his *Miranda* rights. Assistant State's Attorney Barbaro prepared a handwritten statement detailing defendant's account of the crime. Defendant refused to sign the statement, indicating that he only wanted to get the crime "off his chest," but did not want to go to prison. The handwritten statement was read to the jury at trial without objection by the defense. Defendant's account to the detectives and assistant State's Attorney was similar to his account to Officer Becker. He stated that he waited for the victim to leave for work, forced the victim into his own car and drove the car a few blocks from the Christian home where he shot the victim in the chest with a .45-caliber handgun. With respect to his motive for the crime, defendant indicated that he had been involved in a romantic relationship with the victim's wife, Nadine, and that he did not like the way the victim treated Nadine.

Prior to trial, defendant moved to suppress his statements to police on the basis that he had consumed substantial quantities of drugs and alcohol and was fatigued when he spoke with police. Defendant claimed that he was unable to knowingly and intelligently waive his rights under *Miranda*. The trial court denied the motion.

At trial, the State presented the testimony of Mar-

tha Jackson, a coworker of defendant and Nadine Christian at Parklane Jewelry. Jackson testified that she and Nadine had met defendant in August 1982, and Nadine recruited defendant to work for Parklane. Jackson observed defendant and Nadine spending a lot of time together. On one occasion during a celebration at a tavern, Jackson observed defendant and Nadine kissing. Jackson joked that Nadine's husband was coming through the door. Defendant made an obscene gesture and stated that if he could not have Nadine, nobody could. Jackson also testified that on one occasion she observed defendant armed with a handgun in a shoulder holster. She told police the gun was a .45-caliber weapon.

Defendant presented evidence that subsequent to his statements to the authorities, it was determined that the bullet that killed the victim was fired from a .357-caliber weapon rather than a .45-caliber weapon. Defendant's former wife testified that on December 6, 1982, she and defendant woke up together at about 6:30 a.m. and defendant drove her to work, arriving at about 8:20 a.m.

Defendant also presented the testimony of Lisa Shankman, who was defendant's girlfriend in August 1986. Shankman testified that defendant was a regular cocaine user and she was familiar with the manner in which cocaine affected defendant. Shankman saw defendant briefly at about 5 p.m. on August 5, 1986, the day before his arrest, and he appeared to have been drinking or to have been under the influence of some substance. Shankman next saw defendant at 8:30 the next morning and it appeared he was definitely "high on something." It was stipulated that Jean Clark, a bartender or waitress, would testify that on the evening of August 5, 1986, she served defendant a number of drinks. It was further stipulated that Clark would testify

that on a few occasions she observed defendant go into the washroom and on his return he would appear to be "more hyper and more talkative" than before.

Based on the foregoing evidence, the jury found defendant guilty of murder. The trial court found defendant to be eligible for the death penalty because he had a prior murder conviction (see Ill. Rev. Stat. 1981, ch. 38, par. 9—1(b)(3)), and sentenced him to death.

## THE POST-CONVICTION HEARING ACT

The Post-Conviction Hearing Act permits a defendant to mount a collateral attack on his conviction and sentence based on violations of his constitutional rights. *People v. Coleman*, 168 Ill. 2d 509, 522 (1995); *People v. Mahaffey*, 165 Ill. 2d 445, 452 (1995). The scope of post-conviction review is limited to matters which have not been, and could not have been, previously adjudicated. *Coleman*, 168 Ill. 2d at 522; *People v. Brisbon*, 164 Ill. 2d 236, 245 (1995). Determinations of the reviewing court on direct appeal are *res judicata* as to issues actually decided, and issues that could have been raised on direct appeal but were not are waived. *Coleman*, 168 Ill. 2d at 522; *Mahaffey*, 165 Ill. 2d at 452. Moreover, a defendant is entitled to an evidentiary hearing on a post-conviction claim only if he has made a substantial showing, based on the record and supporting affidavits, that his constitutional rights were violated. *Coleman*, 168 Ill. 2d at 537; *People v. Guest*, 166 Ill. 2d 381, 389 (1995). With these principles in mind, we review the dismissal of defendant's post-conviction petition without an evidentiary hearing.

## ANALYSIS

I. Failure to Disclose or Preserve Exculpatory Evidence

Defendant contends that the prosecution violated its constitutional obligation under *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963), and its

progeny to disclose to the defense various evidence that defendant characterizes as exculpatory. *Brady* held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87, 10 L. Ed. 2d at 218, 83 S. Ct. at 1196-97. Subsequently, however, the Court held that regardless of whether specifically requested by the defense, favorable evidence is material and its suppression by the State constitutes a constitutional violation "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682, 87 L. Ed. 2d 481, 494, 105 S. Ct. 3375, 3383 (1985), quoted in *Kyles v. Whitley*, 514 U.S. 419, 433-34, 131 L. Ed. 2d 490, 505, 115 S. Ct. 1555, 1565 (1995). Moreover, the disclosure obligation applies to impeachment evidence as well as evidence bearing directly on guilt or innocence. *United States v. Bagley*, 473 U.S. 667, 676, 87 L. Ed. 2d 481, 490, 105 S. Ct. 3375, 3380 (1985); see *Kyles v. Whitley*, 514 U.S. 419, 434, 131 L. Ed. 2d 490, 505, 115 S. Ct. 1555, 1565 (1995).

A. *Self-incriminating Statements by a Third Party*

Initially, defendant claims that the State had knowledge that another individual, Ronald Baker, had confessed to the murder of Jimmy Christian, but the State failed to disclose this information to defendant. Defendant's post-conviction petition includes the affidavit of a defense investigator who interviewed the Reverend Jerry Gibson. During the interview, Reverend Gibson related that he had spoken with Ronald Baker in connection with Baker's marital troubles and Baker acknowledged having at some point made the statement, "Yes I killed Jimmy Christian, and I'll kill you too." Reverend Gibson believed that this statement had been

addressed to Brian Diffy, and that Baker made the threat because he suspected that his wife and Diffy were having an affair. Reverend Gibson told the defense investigator that he had informed the police of Baker's statements and other information concerning the Jimmy Christian murder. Subsequent to the interview, Reverend Gibson informed the defense investigator that he did not want to become involved in the case again, but that he would testify pursuant to a subpoena. We note that defendant also submitted an affidavit by Brian Diffy which would appear to indicate that any threat by Baker against Diffy was not made directly to Diffy. In his affidavit, Diffy stated, "About three or four months after Jimmy Christian's murder, I heard that Ronald Baker said he had killed Jimmy Christian and would kill me too if I didn't leave his wife alone."

Defendant argues that the information that Ronald Baker had admitted to killing Jimmy Christian was essential to the defense and would have been devastating to the State's case. Defendant apparently assumes, without offering any analysis, that Ronald Baker's alleged confession would have been admissible into evidence had defense counsel known about it and sought to introduce it. The general rule, however, holds to the contrary. An extrajudicial declaration, not under oath, by the declarant that he, and not the defendant on trial, committed the crime is inadmissible as hearsay, though the declaration is against the declarant's penal interest. *People v. Cruz*, 162 Ill. 2d 314, 342 (1994); *People v. House*, 141 Ill. 2d 323, 389-90 (1990); *People v. Bowel*, 111 Ill. 2d 58, 66 (1986); see *People v. Rutherford*, 274 Ill. App. 3d 116, 123 (1995). Such a declaration will be admitted, however, when justice requires. *Cruz*, 162 Ill. 2d at 343. Where there are sufficient indicia of trustworthiness, such out-of-court statements may be admissible as an exception to the hearsay rule. *Cruz*, 162 Ill. 2d at 343; *Bowel*, 111 Ill. 2d at 66.

In *Chambers v. Mississippi*, 410 U.S. 284, 35 L. Ed. 2d 297, 93 S. Ct. 1038 (1973), the United States Supreme Court identified four factors present in that particular case underlying the Court's decision that the defendant was constitutionally entitled to introduce evidence of an extrajudicial third-party confession notwithstanding a common law rule of evidence barring the use of such confessions. The four factors in *Chambers* were: (1) the statement was made spontaneously to a close acquaintance shortly after the crime occurred; (2) the statement was corroborated by other evidence; (3) the statement was self-incriminating and against the declarant's interest; and (4) there was adequate opportunity for cross-examination of the declarant. *Chambers*, 410 U.S. at 300-01, 35 L. Ed. 2d at 311-12, 93 S. Ct. at 1048-49; see *Cruz*, 162 Ill. 2d at 343. The *Chambers* factors are merely guidelines to admissibility rather than "hard and fast requirements" (*House*, 141 Ill. 2d at 390, citing *Bowel*, 111 Ill. 2d at 67) and the presence of all four factors is not a condition of admissibility (*Cruz*, 162 Ill. 2d at 343). Ultimately, admissibility depends on whether the statement was made under circumstances that provide considerable assurance of its reliability by objective indicia of trustworthiness. *Chambers*, 410 U.S. at 300-01, 35 L. Ed. 2d at 311-12, 93 S. Ct. at 1048-49; *Cruz*, 162 Ill. 2d at 343; *Bowel*, 111 Ill. 2d at 67.

Consideration of the four specific *Chambers* criteria does not favor admissibility. While Ronald Baker's alleged statement was self-incriminating and against interest, defendant has failed to establish the other three factors. See *People v. Keene*, 169 Ill. 2d 1, 29-30 (1995) (statement would not have been admissible where only *Chambers* factor present was that statement was self-incriminating). First, it is not known when Baker made his statement, or whether he made the statement to a close acquaintance. Indeed, the identity of the

person to whom the statement was addressed is unknown. Second, there appears to be no meaningful or substantial corroboration of any statements implicating Ronald Baker in the Jimmy Christian murder. Third, assuming that Baker made the self-incriminating statement that has been attributed to him, defendant has failed to establish that Baker would have been available for cross-examination with regard to the statement. Baker might very well have asserted his privilege against self-incrimination rather than answer questions pertaining to any self-incriminating statements. *Cf. Keene*, 169 Ill. 2d at 30. More generally, Baker's alleged statement was not made under circumstances that provide considerable assurance of its reliability by objective indicia of trustworthiness. The statement admitting to the murder was coupled with a threat apparently born of jealousy. As such, the self-incriminating portion of the statement ("I killed Jimmy Christian") may simply represent bravado designed to bolster the threat ("and I'll kill you too").

Because Ronald Baker's alleged self-incriminating statements would not have been admissible, there is no reasonable probability that disclosure of Reverend Gibson's report of the statement to police would have affected the outcome of defendant's trial. Accordingly, defendant has failed to establish that the allegedly undisclosed information was material giving rise to a constitutional obligation to disclose.

### B. *Impeachment Evidence*

Defendant next contends that the State failed to disclose certain information that would have been valuable in impeaching prosecution witness Martha Jackson. The record contains police reports indicating that Jackson was arrested for soliciting the murder of her husband based on information provided by a confidential informant. While a police report indicates that Jackson

confessed to the offense, she was released shortly after her arrest. Subsequently, Jackson apparently agreed to wear an electronic eavesdropping device—a "wire"— and to engage defendant in conversations designed to elicit self-incriminating statements about the Jimmy Christian murder and the plot to kill Martha Jackson's husband. The police filed an application with the circuit court pursuant to section 108A—3 of the Code of Criminal Procedure of 1963 (725 ILCS 5/108A—3 (West 1994)) for authorization to use an eavesdropping device to monitor conversations between Jackson and defendant or certain other individuals. The application was supported by an affidavit from Jackson in which she averred that she had entered into a written contract with defendant pursuant to which defendant agreed to kill Jackson's husband in exchange for $4,000.

Defendant first argues that Martha Jackson's affidavit was not disclosed to the defense at trial, and consequently defendant was deprived of the ability to impeach her based on her sworn confession to soliciting the murder of her husband. The parties disagree as to whether the post-conviction petition sufficiently alleges that the affidavit was in fact withheld from defense counsel. However, defendant's argument is meritless in any event. A witness may be impeached by attacking his or her character with proof of a *conviction* of a crime punishable by death or imprisonment of one year or more or of a crime that involves dishonesty or false statements. *People v. Montgomery*, 47 Ill. 2d 510, 516-19 (1971); *In re A.M.*, 274 Ill. App. 3d 702, 712 (1995). However, only actual convictions may be used for this purpose: proof of arrests, indictments, charges or the actual commission of a crime are not admissible. *People v. Franklin*, 167 Ill. 2d 1, 21 (1995); *People v. Lucas*, 151 Ill. 2d 461, 491 (1992); *In re A.M.*, 274 Ill. App. 3d at 712. Had Martha Jackson been convicted of soliciting the

murder of her husband, evidence of the conviction would have been admissible for impeachment purposes. However, defendant was not entitled to impeach Jackson with independent proof that she committed that offense. Since Jackson's affidavit was inadmissible, it could not have affected the outcome of trial, and thus the confession was not material for purposes of *Brady* and its progeny.

Defendant also contends that the State violated his right to due process by failing to disclose the identity of the confidential informant who originally implicated Martha Jackson in a plot to kill her husband. Defendant insists that "[h]ad the defense been able to investigate Jackson's attempt on her husband's life, her fragile credibility may have come completely unraveled." Since Martha Jackson's possible participation in an unrelated crime which did not result in a conviction was not a proper basis for impeachment, the identity of the confidential informant was in no way material or relevant to this case.

Defendant also surmises that in view of the circumstances of Martha Jackson's arrest and release, Jackson must have entered into an agreement with the authorities whereby, in exchange for her cooperation in the investigation of defendant, no charges would be filed against Jackson arising from the plot to kill her husband. Defendant contends that evidence of such an agreement would have discredited Jackson's trial testimony by showing a motive to testify in the State's favor. This issue was raised and rejected on direct appeal. In his *pro se* brief on direct appeal, defendant advanced the following argument:

"[T]he prosecution with-held [*sic*] vital impeachment evidence from the defendant., [*sic*] on the state's witness Martha Jackson it is a fact that through the reports of the police, and the special prosecutions office., [*sic*] that Martha Jackson was released from custody for her

cooperation that charges for solicitation for murder was [*sic*] droped [*sic*], and that she was claiming that the defendant, was a co-defendant in that case., [*sic*] the prosecutions [*sic*] failure to tender the deals made with the state's witness denied the defendant a fair trial."

This court rejected the argument, finding, *inter alia*, that "defendant did not show that the discovery material purportedly withheld from the defense would have been favorable to defendant or material to his guilt or punishment." *People v. Pecoraro*, 144 Ill. 2d 1, 20 (1991). The principles of *res judicata* bar relitigation of this issue.

Even if the issue were properly before us, our decision would be no different. Assuming, *arguendo*, that the State actually promised Jackson leniency in exchange for her cooperation in the investigation, the nondisclosure of the agreement would not have impaired the defense in view of other information that was in fact disclosed. The record shows that defense counsel had knowledge from police reports of essentially the same information that defendant presently relies on as circumstantial evidence of an agreement or promise of leniency. Trial counsel's affidavit submitted in support of the post-conviction petition states:

"I had received police reports which related that the police had arrested Martha Jackson on suspicion of solicitation to murder her husband. Thereafter, she was released, and arrangements were made to secure her cooperation in attempting to prove John Pecoraro's complicity in the murder of Jimmy Christian. This included having her set up a meeting with John Pecoraro and 'wiring' Martha Jackson when she met with John Pecoraro."

If, as defendant argues, this information is presently sufficient to create an inference that Jackson had an agreement with the State, then there is no reason why defendant could not have relied on the same inference at trial to discredit Jackson's testimony. Armed with information regarding the circumstances of Jackson's

involvement in the case, trial counsel was fully equipped to probe the witness' possible bias or motive to fabricate based on any explicit or implicit agreements or promises of leniency. However, counsel made a decision, presumably as a matter of strategy, not to pursue this approach. Granted, definitive proof at trial of an agreement would have been preferable to circumstantial proof. Even so, we regard it as highly unlikely that any nondisclosure affected either trial strategy or the ultimate outcome of trial.

### C. *Disclosure of Impeachment Evidence to the Jury*

In a related claim, defendant asserts that in addition to its disclosure obligations to the defense, the prosecution was constitutionally required to inform *the jury* of the circumstances of Martha Jackson's involvement in this case. In support of this argument, defendant relies, in part, on *People v. Holmes*, 238 Ill. App. 3d 480 (1992). In *Holmes*, the court stated that "[i]t is well settled that if a witness offers testimony in exchange for some beneficial treatment from the State, the State must disclose that information to the jury." *Holmes*, 238 Ill. App. 3d at 490-91. The cases cited in *Holmes*—*Napue v. Illinois*, 360 U.S. 264, 3 L. Ed. 2d 1217, 79 S. Ct. 1173 (1959), *Giglio v. United States*, 405 U.S. 150, 31 L. Ed. 2d 104, 92 S. Ct. 763 (1972), and *People v. Bolton*, 10 Ill. App. 3d 902 (1973)—do not stand for this broad proposition.

In *Napue* a witness at a murder trial falsely testified that he received no consideration from the State in exchange for his testimony. While the assistant State's Attorney was aware that the testimony was false, he took no action to correct it. The Court reversed the defendant's conviction. The Court noted that a conviction through the use of evidence known by the State to be false must be reversed, and the same result obtains when the State, although not soliciting false evidence,

allows it to go uncorrected when it appears. The Court further noted that it was of no consequence that the false testimony bore upon the witness' credibility rather than directly upon guilt or innocence. Similarly, in *Bolton*, a State's witness also falsely denied the existence of an agreement with the State, and the State failed to correct the false testimony. In *Giglio*, the Court held that a promise made to a witness by one attorney for the government would be attributed to the prosecution. In *Giglio*, the Court reversed the defendant's conviction where a prosecution witness falsely denied that any promises of leniency had been made, even though the prosecutor appearing at trial was personally unaware of the falsity of the testimony. Accordingly, in each of these cases, the prosecution's obligation to reveal the existence of an agreement with a witness arose only because of the witness' false testimony on the subject. These cases merely impose an obligation to correct false evidence. Under our adversarial system, the State is not required in the first instance to impeach its own witnesses with all evidence bearing on their credibility.

In addition to *Holmes*, defendant cites certain federal court decisions which also appear to suggest that the prosecution has an affirmative duty to inform the jury of any agreements or promises of leniency to its witnesses. See *Campbell v. Reed*, 594 F.2d 4, 7 (4th Cir. 1979) (stating that *Giglio* held that "the prosecution's failure to present all material evidence to the jury constituted a denial of due process"); *United States v. Pope*, 529 F.2d 112, 114 (9th Cir. 1976) (citing *Giglio* as holding that "[i]t is inconsistent with the rudimentary demands of a fair trial for the prosecuting attorney to fail to disclose to the court that a material prosecution witness has had the benefit of a plea bargain"). To the extent these cases stand for this proposition, like *Holmes*, they reflect a misreading of the applicable

United States Supreme Court decisions. Defendant does not contend that Martha Jackson testified falsely regarding any agreement with the State or the circumstances surrounding her involvement with this case. Accordingly, the State was not obligated to disclose this information to the jury.

## D. *Tape-Recorded Conversation*

As previously noted, Martha Jackson engaged in a conversation with defendant while wearing a "wire" in an attempt to elicit incriminating statements. The conversation was tape-recorded and defendant presently claims that the tape of the conversation was withheld from the defense. Apparently, the tape cannot be located and was unavailable during the post-conviction proceedings below. Defendant claims that the tape would have been useful to the defense because during the conversation "Martha Jackson recited facts *** which later found their way into [defendant's] alleged oral confession." The only information in the record regarding the content of the conversation appears in an affidavit executed by defendant. Having reviewed the affidavit, we conclude there is no reasonable probability that disclosure of the tape would have affected the outcome of defendant's trial. Even if defendant had been able to show that Martha Jackson had discussed the details of the murder with him, it is unlikely that the jury would have rejected defendant's confession on that basis. Accordingly, defendant has failed to show a constitutional violation.

## E. *Polygraph Results*

Defendant next contends that constitutional error occurred because the State did not reveal to the defense that Ronald Baker and Martha Jackson "failed" lie detector tests administered in connection with the investigation of this case. The record reflects that poly-

graph examinations were administered to Baker and Jackson. With respect to the examination of Baker, the examiner concluded that Baker may have had some knowledge about the Jimmy Christian murder. With respect to the examination of Jackson, the examiner concluded that Jackson was untruthful in her answers to questions regarding her knowledge of a plot to kill her husband and knowledge of the Jimmy Christian murder. However, defendant's post-conviction petition, as amended and supplemented, contains no claim that the prosecution suppressed this information in violation of defendant's constitutional rights. The Post-Conviction Hearing Act provides that "[a]ny claim of substantial denial of constitutional rights not raised in the original or an amended petition is waived." 725 ILCS 5/122—3 (West 1994).

Considerations of waiver aside, defendant's claim is meritless. Evidence of polygraph results is inadmissible both at trial and at a capital sentencing hearing. *People v. Sanchez*, 169 Ill. 2d 472, 493 (1996). Notwithstanding the inadmissibility of the polygraph results, defendant argues in a conclusory manner that the information would have assisted defense counsel in his investigation of the case. Defendant's claim is based on pure speculation, which is insufficient to establish a reasonable probability that the outcome of defendant's trial would have been different. See *Wood v. Bartholomew*, 516 U.S. 1, 133 L. Ed. 2d 1, 116 S. Ct. 7 (1995). Accordingly, defendant has failed to establish that the polygraph results were material for purposes of *Brady* and its progeny.

F. *Failure to Document Defendant's Condition During Interrogation by Police*

Defendant next contends that his right to due process was violated because the police failed to preserve evidence bearing on his physical and mental condition at the time he made incriminating statements to the

authorities. Defendant argues that in view of his physical appearance and statements he made to police regarding recent drug use and lack of sleep, the police were obligated to create an objective record of his condition. According to defendant, the officers should have conducted or arranged blood or breath testing to determine the presence of drugs or alcohol, and should have videotaped defendant's conversations. Defendant maintains that such evidence would have assisted the defense in proving that defendant was unable to knowingly and intelligently waive his rights under *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966).

In *California v. Trombetta*, 467 U.S. 479, 488-89, 81 L. Ed. 2d 413, 422, 104 S. Ct. 2528, 2534 (1984), relied on by defendant, the United States Supreme Court stated:

> "Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality [citation], evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means."

*Trombetta* held that when police conduct breath tests to determine the blood-alcohol level of a motorist suspected of driving while under the influence of alcohol, due process does not require preservation of the motorist's breath sample for use by the defense in verifying the accuracy of the breath test. Based on evidence showing that the breath-analysis equipment was highly accurate, the Court reasoned that the chances were extremely low that a preserved breath sample would be exculpatory, and a malfunction in the breath-analysis equipment could be demonstrated in other ways.

Subsequently, in *Arizona v. Youngblood*, 488 U.S. 51, 58, 102 L. Ed. 2d 281, 289, 109 S. Ct. 333, 337 (1988), the Court held that unless a criminal defendant can

show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process. In so holding, the Court distinguished the failure to preserve evidence from the failure to disclose material exculpatory evidence in the State's possession where the good or bad faith of the State is irrelevant. *Youngblood*, 488 U.S. at 57, 102 L. Ed. 2d at 289, 109 S. Ct. at 337. The *Youngblood* Court also explained that "[t]he presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Youngblood*, 488 U.S. at 56 n.\*, 102 L. Ed. 2d at 288 n.\*, 109 S. Ct. at 336 n.\*.

Applying these principles from *Trombetta* and *Youngblood*, we conclude that defendant's claim is meritless. The record reveals that at the time defendant spoke with police, he informed them that he had used cocaine a few hours earlier. Defendant also related either that he had not slept in two days or that he had not slept the previous night. Nonetheless, at the hearing on defendant's motion to suppress his statements, the police officers who observed defendant and the assistant State's Attorney who interviewed him each testified that defendant did not appear to be intoxicated or under the influence of drugs. The assistant State's Attorney specifically testified that although defendant's eyes appeared bloodshot, "his walking was fine and his speech was fine." In view of this testimony, defendant cannot show that it was apparent that videotaping defendant's demeanor or conducting drug and alcohol testing would have produced exculpatory evidence. Likewise, defendant cannot show that the authorities acted in bad faith in failing to take these steps. *Cf. United States v. Weise*, 89 F.3d 502, 504 (8th Cir. 1996) (failure by police to administer blood-alcohol test to de-

fendant convicted of second degree murder did not violate due process where police officers testified that defendant appeared to be in control of his thoughts and actions at the time of his arrest).

Defendant alternatively argues that even if the failure to preserve evidence of his condition did not violate the United States Constitution under *Trombetta*, this court is free to hold that failure violative of the due process clause of our state constitution. Ill. Const. 1970, art. I, § 2. Defendant relies on *Gunderson v. Municipality of Anchorage*, 792 P.2d 673 (Alaska 1990), where, notwithstanding *Trombetta*, the Supreme Court of Alaska held that in a prosecution for driving while intoxicated, the failure to preserve breath samples for independent testing violated the due process clause of Alaska's constitution. We decline to apply *Gunderson* in the present setting and instead adhere to the well-reasoned principles set forth in *Trombetta* and *Youngblood* for purposes of our state due process clause.

### G. *Pro Se Arguments*

In his *pro se* brief defendant advances many of the same arguments set forth in the brief submitted by counsel regarding nondisclosure of evidence. Defendant also complains that the State failed to disclose: (1) the order authorizing the use of an eavesdropping device to monitor his conversation with Martha Jackson; (2) a statement by the informant who implicated Martha Jackson in a plot to kill her husband; (3) that the victim's wallet had been recovered; (4) any crime laboratory reports regarding the wallet; and (5) a tape cartridge found in the victim's car. Defendant has failed to explain how any of the foregoing would be exculpatory. Defendant also complains that the State failed to disclose the identity of Tom Wolverton, whom defendant considers a possible suspect in the case. As will be seen in our discussion below of defendant's ineffective-

assistance-of-counsel claim, available information regarding Tom Wolverton would not have affected the outcome of trial and therefore was not material under *Brady* and its progeny. Accordingly defendant's *pro se* arguments are meritless.

## II. Ineffective Assistance of Counsel

Defendant contends that he was deprived of effective assistance of counsel by the Cook County public defender's office, which represented him at the hearing on his motion to suppress, and by the privately retained attorney who represented him at trial. In support of this claim, defendant submitted an affidavit from an attorney experienced in the defense of capital cases who reviewed the record and formed the opinion that the performance of defendant's trial attorneys was not in conformity with accepted professional standards for the defense of capital cases and fell below an objective standard of reasonableness.

Claims of ineffective assistance of counsel based on deficient representation of a criminal defendant are evaluated in accordance with the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). Initially, the defendant must show deficient performance. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064. The defendant must show that counsel's performance fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 688, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064. Moreover, judicial scrutiny of counsel's performance is highly deferential and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the

presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' [Citation.]" *Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065.

Even where deficient performance is shown, the defendant must also show prejudice in order to establish an ineffective-assistance claim. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.

A. *Trial Counsel's Lack of Experience and Resources and Failure to Present a Coherent Defense*

At the outset we consider defendant's general claim that his sixth amendment right to effective assistance of counsel was violated because trial counsel was unqualified to represent him due to lack of training and experience. Defendant observes that trial counsel had previously conducted only four jury trials, had no staff or co-counsel to rely upon, and lacked specific training in the defense of capital cases. Defendant also notes that his attorney represented him for a total fee of $200. According to defendant, his attorney should have requested that the court appoint co-counsel and provide funds for investigative assistance, mitigation experts and other experts as needed. As noted in *People v. Lear*, 175 Ill. 2d 262, 274 (1997), "[h]aving a counsel with limited resources and limited experience is not a circumstance which this court has held to constitute *per se* ineffective assistance of counsel." In *Lear* counsel had only been out of law school for two years when appointed to represent the defendant, counsel had never tried a capital or homicide case before, counsel had received no formal training in defense of capital cases, counsel's office employed no

investigators or other attorneys, the only assistance counsel received was from another attorney who performed 60 hours of legal research, and counsel had numerous other pending cases. As in *Lear*, counsel's alleged inexperience and lack of resources in the present case would be insufficient in itself to give rise to a sixth amendment violation. Rather, under *Strickland*'s two-part test, defendant must establish specific errors by counsel and resultant prejudice.

Defendant also argues that trial counsel presented no coherent theory of defense to the jury. We emphatically disagree. Faced with evidence that defendant had approached police on his own initiative and confessed to the crime, counsel performed competently, albeit unsuccessfully, in attempting to undermine the State's case. Counsel presented testimony from defendant's former wife that defendant was with her on the morning of the crime. Counsel also elicited testimony from defendant's girlfriend that defendant was a heavy drug user and might have used drugs, alcohol or both at the time of his statements to police. While defendant allegedly confessed to killing the victim with a .45-caliber weapon, counsel established that the gun used was actually a .357-caliber weapon. Counsel vigorously cross-examined the State's witnesses and successfully objected on a number of occasions to the State's attempts to introduce hearsay testimony. During closing argument, counsel attempted to discredit defendant's confession, arguing that he was under the influence of drugs and alcohol and pointing out the discrepancy in defendant's statements as to the weapon used. Counsel also argued that defendant's confession omitted certain details of the offense and that aspects of defendant's account to police were contrary to human experience. In addition, counsel emphasized the lack of eyewitnesses and physical evidence implicating defendant. Defendant's charge that

counsel failed to provide a coherent defense is unfounded.

### B. *Inadequate Pretrial Investigation*

Defendant claims that trial counsel failed to adequately investigate the possibility that Ronald Baker was responsible for the murder of Jimmy Christian. Defendant first asserts that counsel should have interviewed Reverend Jerry Gibson, and that had he done so, he would have learned of Ronald Baker's alleged admission to killing Jimmy Christian. As discussed earlier, Baker's allegedly self-incriminating statements would not have been admissible. Accordingly, the failure to interview Reverend Gibson did not affect the outcome of the case and defendant has failed to establish prejudice under *Strickland.*

Defendant also maintains that counsel rendered deficient performance by failing to interview Baker's former wife, Pat, and her one-time paramour and present husband, Brian Diffy. Defendant argues that had counsel done so, he would have learned that Ronald Baker was a drug addict who sold drugs to support his habit. According to defendant, counsel also would have learned that Baker was a violent, jealous and paranoid individual, that the victim sometimes rode to work with Pat, and that members of Baker's family once assaulted Diffy because of his relationship with Pat. Defendant asserts that this information would have supported the theory that Baker may have killed Jimmy Christian because of jealousy.

Defendant's argument is meritless. The record reveals that Brian Diffy and Pat Diffy (formerly Pat Baker) were each privy to essentially the same information about Ronald Baker, and thus interviewing both Pat and Brian (as opposed to one or the other) would not have advanced counsel's investigation. Defendant's claim fails because the record does not clearly substanti-

ate the assertion that trial counsel failed to interview Pat Diffy. Trial counsel's affidavit submitted with defendant's post-conviction petition specifically identifies a number of witnesses who were not interviewed, including Brian Diffy. With respect to Pat Diffy, however, the affidavit merely indicates that although subpoenaed, she was not called to testify at trial. The affidavit is silent as to whether or not she was interviewed. It is also unclear from Pat Diffy's affidavit whether defense counsel interviewed her. Her affidavit merely states that she had a "brief conversation" with defense counsel, but does not detail the content of that conversation.

Defendant also contends that an adequate investigation would have revealed: (1) that packets of a white powder were found in the victim's car, "suggesting the possibility of a drug deal gone awry"; (2) that Baker missed work the day of the murder; and (3) that a polygraph examination was administered to Ronald Baker, and the examiner concluded that Baker may have had some knowledge of the Jimmy Christian murder. Contrary to defendant's assertions, trial counsel's affidavit shows that he was aware of the packets of white powder found in the victim's car. In fact, trial counsel cross-examined one of the investigating officers about the packets. Defendant cites a police report in support of the assertion that Ronald Baker was absent from work the day of the murder. Defendant has not alleged that the prosecution suppressed this report, and hence defendant has failed to show that defense counsel was unaware of this information. Finally, as discussed earlier, the results of Baker's polygraph would have been inadmissible at trial and sentencing. Thus, even if defense counsel failed to discover the polygraph results, as defendant asserts, no prejudice under *Strickland* resulted.

Defendant further claims that trial counsel's failure to interview Martha Jackson and numerous other witnesses represents ineffective assistance of counsel. While defendant broadly argues that the failure to interview these witnesses impaired his ability to effectively cross-examine them, the possibility that the result of the trial was thereby affected is wholly speculative. A defendant cannot rely on speculation or conjecture to justify his claim of incompetent representation. *People v. Holman*, 164 Ill. 2d 356, 369 (1995). Accordingly, this argument is without merit.

Defendant also contends that trial counsel's failure to interview Nadine Christian's uncle, Tom Wolverton, constitutes ineffective assistance of counsel. The record contains an anonymous letter found in Jimmy Christian's wallet charging that Wolverton was having an affair with Nadine. In addition, a police report indicates that defendant and Martha Jackson had a conversation in which they discussed "how Nadin's [*sic*] uncle Tom had been caught in bed with her by the victim and thrown from the house by the victim." Defendant contends that Wolverton thus had a motive to kill Jimmy Christian.

Counsel has only a duty to make reasonable investigations or to make a reasonable decision which makes particular investigations unnecessary, and the reasonableness of a decision to investigate is assessed applying a heavy measure of deference to counsel's judgment. *People v. Orange*, 168 Ill. 2d 138, 149 (1995). Where circumstances known to counsel at the time of his investigation do not reveal a sound basis for further inquiry in a particular area, it is not ineffective for the attorney to forgo additional investigation. *Orange*, 168 Ill. 2d at 150. Thus, counsel is not necessarily required to investigate every individual with some conceivable motive to kill the victim. It was entirely reasonable for counsel to

focus his strategy on the weaknesses in the State's case rather than developing a speculative theory assigning blame for the murder to Tom Wolverton. With regard to our assessment of counsel's decision, we note that "[w]here circumstantial evidence relied upon to support the defense that another committed the crime is unsatisfactory, based upon mere surmise or possibility, without evidence to support it, a hypothesis of innocence may be rejected by the trier of fact." *People v. Coleman*, 168 Ill. 2d 509, 533 (1995).

Moreover, both the anonymous letter and the information related in the police report alleging a sexual relationship between Nadine Christian and Tom Wolverton are inadmissible as hearsay. Since defendant has failed to produce any admissible evidence that Tom Wolverton had a motive to kill Jimmy Christian, there is no basis to conclude that any investigation counsel might have conducted would have produced any evidence useful to the defense. Accordingly, defendant has not demonstrated that the failure to interview Tom Wolverton, or otherwise investigate his possible responsibility for the murder, was prejudicial under *Strickland*.

Defendant also alludes to counsel's failure to investigate an individual named Jack Louvier. Defendant contends that Louvier moved to Texas with Nadine Christian shortly after the murder and, accordingly, Louvier should be considered yet another possible suspect in the murder of Jimmy Christian. Because defendant's post-conviction petition as amended and supplemented contains no allegations related to the failure to investigate Jack Louvier, the issue is waived. In any event, the theory that Jack Louvier was involved in the murder is entirely speculative. There is no reasonable probability that a defense theory implicating Jack Louvier as the killer would have succeeded.

### C. *Deficient Cross-Examination*

Defendant next argues that trial counsel's perfor-

mance in cross-examining Martha Jackson was deficient. As detailed earlier, Jackson testified for the State that on one occasion she had observed defendant and Nadine Christian kissing in a bar, and that defendant had stated that if he could not have Nadine, no one could. Jackson also testified that on one occasion she saw defendant armed with a handgun carried in a shoulder holster at the Christians' home. Defendant contends that his trial attorney should have attacked Jackson's credibility with evidence of the circumstances of her involvement in the murder investigation. According to defendant, his attorney should have tried to discredit Jackson with evidence suggesting that she assisted in the investigation because she had been implicated in a separate plot to murder her husband. Defendant also contends that trial counsel failed to properly impeach Jackson with prior inconsistent statements relating to her testimony that she observed defendant with a handgun, and failed to object to certain irrelevant or otherwise inadmissible testimony. Defendant essentially raised the same issues on direct appeal. In his *pro se* brief on direct appeal, defendant contended that trial counsel's failure to impeach Martha Jackson based on her relationship with the authorities and counsel's failure to object to prejudicial testimony constituted ineffective assistance of counsel. This court rejected the argument (see *People v. Pecoraro*, 144 Ill. 2d 1, 12-14 (1991)), and under the principle of *res judicata*, that disposition is controlling here.

In any event, defendant's claim of deficient cross-examination is meritless. Generally, the decision whether or not to cross-examine or impeach a witness is a matter of trial strategy which will not support a claim of ineffective assistance of counsel. *People v. Franklin*, 167 Ill. 2d 1, 22 (1995). The manner in which to cross-examine a particular witness involves the exercise of professional judgment which is entitled to substantial

deference from a reviewing court. Defendant can only prevail on an ineffectiveness claim by showing that counsel's approach to cross-examination was objectively unreasonable. Similarly, as stated in the opinion on defendant's direct appeal, trial strategy ordinarily encompasses decisions such as what matters to object to and when to object. *Pecoraro*, 144 Ill. 2d at 13.

In the case at bar, trial counsel vigorously cross-examined Martha Jackson. With regard to the episode where defendant and Nadine had been kissing at a bar, counsel emphasized that the group assembled at the bar had been drinking and defendant had several drinks that night, thus suggesting that the events that transpired were an isolated indiscretion.

Counsel was also able to gain some advantage from Jackson's testimony that she had seen defendant with a handgun. On cross-examination, Jackson admitted that she described the weapon to police as a .45-caliber handgun. This point is significant because the State's evidence showed that defendant confessed to having killed Jimmy Christian using a .45-caliber weapon, when ballistics tests later revealed that a .357-caliber weapon had been used. Thus, Jackson's testimony bolstered the theory that the police had composed defendant's confession. Notwithstanding defendant's argument that cross-examination might have been handled differently, we cannot say that trial counsel's approach fell outside the wide range of reasonable professional assistance. We thus reaffirm the decision on this point in defendant's direct appeal.

### D. *Failure to Introduce Expert Testimony*

Defendant claims that the assistant public defenders who represented him at his suppression hearing erred by failing to present expert testimony regarding the effect of drug and alcohol use on his ability to knowingly and intelligently waive his *Miranda* rights. Similarly,

defendant contends that the privately retained attorney who represented him at trial should have introduced expert testimony showing that the use of drugs and alcohol rendered his self-incriminating statements to police unreliable and unworthy of belief. In support of this claim defendant submitted two affidavits from Louis Hemmerich, Ph.D., a clinical psychologist. In his initial affidavit, Dr. Hemmerich relied on the transcript of the hearing on defendant's motion to suppress. At the suppression hearing, Joseph Siemioneko testified that prior to defendant's arrest defendant had consumed at least six beers and $1^1/4$ grams of cocaine. Defendant testified that he had used a substantial amount of cocaine prior to joining Siemioneko. Based on Siemioneko's testimony, Dr. Hemmerich formed the opinion defendant's blood-alcohol content was well above the legal limit and that he was intoxicated at the time of his arrest. Dr. Hemmerich also indicated that the chief dangers of combining alcohol and cocaine were cocaine psychosis and blackout. Cocaine psychosis is characterized by poor reality testing, impaired judgment, inability to comprehend and integrate information, paranoia and delusions. Cocaine delusions involve confabulation: one makes up what is perceived to be the truth. According to Dr. Hemmerich's affidavit, if defendant had previously been a suspect in a murder case and was aware of some of the facts of the case, cocaine psychosis might give rise to the delusion that he had actually committed the crime even if he had not.

Dr. Hemmerich's affidavit also states that a person experiencing blackouts often fabricates and does and says things which he does not remember following the blackout. Dr. Hemmerich offered the opinion that a person experiencing these conditions would be unable to understand the significance of his *Miranda* rights or appreciate the significance of waiving those rights, and

that during a blackout defendant may have assented to suggestions presented in leading questions by police. Finally, Dr. Hemmerich indicated that a person experiencing these conditions could appear to be unimpaired to an observer who had not been specifically trained to detect intoxication.

Dr. Hemmerich submitted his second affidavit after interviewing defendant. Based on the interview, Dr. Hemmerich formed the opinion that: (1) defendant was most likely experiencing a blackout as a result of excessive consumption of alcohol and drugs; (2) in this condition defendant would not have been able to understand the significance of his *Miranda* rights or their waiver; and (3) defendant's blackout may have gone undetected by others.

Defendant claims that had expert testimony of this nature been presented to the trial court during the hearing on defendant's motion to suppress, there is a reasonable probability the court would have suppressed his statements to police. Defendant also argues that had testimony been presented to the jury at trial, there is a reasonable probability it would have found a reasonable doubt as to defendant's guilt.

We conclude that the failure to introduce expert testimony during the suppression hearing was not prejudicial under *Strickland*. Dr. Hemmerich's opinion regarding defendant's ability to waive his *Miranda* rights was based, at least in part, on defendant's own account of his drug and alcohol use prior to his arrest. However, the trial court specifically rejected defendant's account, deeming it "exaggerated and at times untruthful." Given this rejection of the factual basis for the opinion regarding defendant's waiver of his *Miranda* rights, it is doubtful that the court would have found the ultimate opinion persuasive. In this regard, we note that even if expert testimony had been presented, the

court would not have been required to accept the expert's conclusions. *People v. Mahaffey*, 165 Ill. 2d 445, 463 (1995).

We also conclude that defendant suffered no prejudice due to the failure to introduce expert testimony at trial. We note that Dr. Hemmerich merely suggested that it was possible that if defendant was suffering cocaine psychosis and associated delusions he might falsely confess to a crime merely because he had been implicated in it. Dr. Hemmerich did not elaborate on how likely it was that this would occur. Dr. Hemmerich also explained that if experiencing a blackout during interrogation, defendant might have assented to leading questions by police. Here, however, the record shows that defendant flagged down a police officer at random and gave a somewhat detailed account of the offense. That officer had no prior knowledge of the offense and it is thus impossible that this initial confession was the product of leading or prompting by police. Under the circumstances, defendant has failed to show a reasonable probability that expert testimony would have altered the outcome of the suppression hearing or trial.

### III. Post-Conviction Discovery

During the post-conviction proceedings below, defendant moved to take discovery depositions from various individuals. Defendant contends that the denial of these motions was error. We note that while defendant appears to take the position that the denial of every one of his discovery requests was error, in his brief, defendant only specifically addresses the denial of a few of his requests. Specifically, defendant contends that he should have been permitted to take depositions from Reverend Jerry Gibson, Detective Raymond Schalk, Detective Bogucki and police officer Ralph Storck. We limit our analysis to the denial of the discovery motions relating to these individuals.

In a post-conviction proceeding, the trial court has inherent discretionary authority to order discovery. *People v. Henderson*, 171 Ill. 2d 124, 156 (1996); *People ex rel. Daley v. Fitzgerald*, 123 Ill. 2d 175, 183 (1988). In deciding whether to permit the taking of a discovery deposition the circuit court should consider, among other relevant circumstances, the issues presented in the post-conviction petition, the scope of discovery sought, the length of time between the conviction and the post-conviction proceeding and the burden the deposition would impose on the opposing party and on the witness. *Fitzgerald*, 123 Ill. 2d at 183-84.

Defendant sought to depose Reverend Gibson with regard to Ronald Baker's possible responsibility for the murder of Jimmy Christian. In his motion and argument to the circuit court, defendant failed to suggest how this information would be relevant to a violation of defendant's constitutional rights. The denial of defendant's motion to depose Reverend Gibson was not an abuse of discretion.

Defendant sought to depose Detectives Schalk and Bogucki to learn whether the police had entered into any agreements with Martha Jackson in exchange for her assistance in investigating defendant. We have already held that the disclosure of any such agreement that may have existed would not have affected the outcome of trial. Under these circumstances the denial of the motion to depose these detectives was not error.

Defendant apparently sought to depose Officer Storck in connection with the theory that trial counsel was ineffective for failing to investigate the possibility that a former police officer named Jack Louvier may have been responsible for the murder.[1] We have already stated that this theory of the offense was too speculative

---

[1] Defendant has supplied an affidavit from his former wife, Gwenn Fritz. Fritz indicated that Officer Storck informed her

to support an ineffective-assistance-of-counsel claim. We find nothing in the record to suggest that Officer Storck was aware of any meaningful evidence implicating Jack Louvier in the crime such as would have bolstered defendant's otherwise meritless claim. Accordingly the circuit court did not err in denying the motion to depose Officer Storck.

IV. Denial of the Right to Self-Representation

After trial, defendant filed a *pro se* motion for a new trial, a *pro se* supplemental motion for a new trial or judgment notwithstanding the verdict and a *pro se* motion in arrest of judgment. Defendant also moved to be permitted to act as co-counsel. Addressing defendant in open court, the trial court stated, "My understanding of the law *** is that *** you have a right to represent yourself or of course you have the right to be represented by an attorney but you can't do both or you can't take a position in between." However, the trial court allowed defendant to submit his *pro se* motions and permitted defense counsel to argue the motions.

Defendant argues through counsel and in his *pro se* brief that the trial court violated his absolute constitutional right to self-representation under *Faretta v. California*, 422 U.S. 806, 45 L. Ed. 2d 562, 95 S. Ct. 2525 (1975). *Faretta* held that a criminal defendant has a constitutional right to refuse state-provided counsel and proceed without representation if he voluntarily and intelligently elects to do so. See *People v. Coleman*, 168 Ill. 2d 509, 544 (1995). A trial court may appoint standby counsel to assist the defendant. *Faretta*, 422 U.S. at 834 n.46, 45 L. Ed. 2d at 581 n.46, 95 S. Ct. at 2541 n.46.

that the police were incorrect in their belief that Nadine Christian was having an affair with defendant. Instead, Nadine was observed associating with an "ex-cop." Defendant submits that the former officer was Jack Louvier and that Nadine moved to Texas with Louvier.

However, *Faretta* does not require the trial judge to permit " 'hybrid' representation." *McKaskle v. Wiggins,* 465 U.S. 168, 183, 79 L. Ed. 2d 122, 136, 104 S. Ct. 944, 953 (1984). See also *United States v. Callwood,* 66 F.3d 1110, 1114 (10th Cir. 1995); *Cain v. Peters,* 972 F.2d 748, 750 (7th Cir. 1992). It has been stated that there is "a crucial difference between a defendant seeking to represent himself and a defendant asking to serve as 'cocounsel' in his defense. The defendant has no absolute right to the latter. Instead, '[t]he decision to grant or deny "hybrid representation" lies solely within the discretion of the trial court.' [Citation.]" *United States v. Stevens,* 83 F.3d 60, 67 (2d Cir. 1996). In view of these principles, the denial of defendant's request to act as cocounsel was not a violation of defendant's constitutional right of self-representation.

Defendant further argues through counsel that the failure of his appellate attorneys to raise this issue on direct appeal constitutes ineffective assistance of counsel. Claims of ineffective assistance of appellate counsel are evaluated under the standard set forth in *Strickland,* 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, which, as previously noted, requires the defendant to show both deficient performance by counsel and resultant prejudice. See *People v. Coleman,* 168 Ill. 2d 509, 523 (1995). Since we have concluded that the issue of defendant's right to self-representation is meritless, defendant suffered no prejudice under *Strickland* as a result of appellate counsel's failure to raise the issue. See *Coleman,* 168 Ill. 2d at 523.

## V. Actual Innocence

Finally, we note that defendant argues that he is actually innocent of the murder of Jimmy Christian and is therefore entitled to an evidentiary hearing on his post-conviction claims under the principles of *Schlup v. Delo,* 513 U.S. 298, 130 L. Ed. 2d 808, 115 S. Ct. 851

(1995). *Schlup* essentially held that a petitioner in a federal *habeas corpus* action is entitled to consideration of the merits of otherwise procedurally barred constitutional claims if the petitioner is able to show, based on newly discovered evidence of innocence, that it is more likely than not that no reasonable juror would have convicted the petitioner. *Schlup*, 513 U.S. at 327, 130 L. Ed. 2d at 836, 115 S. Ct. at 867; *Schlup*, 513 U.S. at 333, 130 L. Ed. 2d at 839-40, 115 S. Ct. at 869-70 (O'Connor, J., concurring). Assuming, without deciding, that *Schlup* should be applied in state post-conviction proceedings, we note that we have in fact considered the merits of the large majority of defendant's post-conviction claims and *Schlup* would require no more with respect to those claims.[2] In any event, defendant has failed to make the requisite showing under *Schlup* that based on newly discovered evidence of innocence it is more likely than not that *no* reasonable juror would have convicted defendant. Accordingly *Schlup* does not apply.

We further observe that this court has recently recognized the viability of a "free-standing" post-conviction claim of "actual innocence" based on new evidence of actual innocence. See *People v. Washington*, 171 Ill. 2d 475 (1996). To entitle the defendant to relief, the supporting evidence must be new, material, noncumulative and of such conclusive character as would probably change the result on retrial. *Washington*, 171 Ill. 2d at 489. We note that defendant has not attempted to assert such a free-standing claim, nor given the record, could he do so successfully.

## CONCLUSION

For the foregoing reasons, the judgment of the

---

[2]*Schlup* only addresses the applicability of procedural bars to consideration of the merits of constitutional claims; it has no bearing on the general standard for determining whether an evidentiary hearing must be held on a nonbarred claim.

circuit court of Cook County dismissing defendant's post-conviction petition is affirmed. The clerk of this court is directed to enter an order setting Tuesday, May 13, 1997, as the date on which the sentence of death, entered in the circuit court of Cook County, is to be carried out. Defendant shall be executed in the manner provided by law. 725 ILCS 5/119—5 (West 1994). The clerk of this court shall send a certified copy of the mandate to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution where defendant is now confined.

*Affirmed.*