NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2020 IL App (4th) 180558-U

NO. 4-18-0558

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
February 11, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Macon County |
| TRE M. McSPADDEN, | ) | No. 11CF594 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Thomas E. Griffith Jr., |
| | ) | Judge Presiding. |

JUSTICE TURNER delivered the judgment of the court.
Justices DeArmond and Harris concurred in the judgment.

**ORDER**

¶ 1   *Held*: The circuit court did not err by dismissing defendant's postconviction
petition at the second stage of the postconviction proceedings.

¶ 2        In October 2016, defendant, Tre M. McSpadden, filed a petition under the Post-

Conviction Hearing Act (Postconviction Act) (725 ILCS 5/122-1 *et seq.* (West 2016)) raising

numerous claims of ineffective assistance of trial counsel.  In a January 2017 written order, the

Macon County circuit court advanced defendant's petition to the second stage of the

proceedings.  The State filed a motion to dismiss defendant's postconviction petition.  Defendant

filed a supplemental/amended postconviction petition challenging his aggregate 72-year prison

sentence.  The State then filed a motion to dismiss defendant's supplemental/amended

postconviction petition.  After a March 2018 hearing, the court granted the State's motion to

dismiss the original postconviction petition but denied the State's motion to dismiss the

supplemental/amended petition. At a July 2018 third-stage hearing, the State conceded defendant's supplemental/amended petition, and the court held a new sentencing hearing. The court sentenced defendant to a prison term of 26 years for first degree murder to run consecutive to two concurrent prison terms of nine years for the attempt (first degree murder) convictions.

¶ 3        Defendant appeals, asserting the circuit court erred by granting the State's motion to dismiss his original postconviction petition. We affirm.

¶ 4                                I. BACKGROUND

¶ 5        In May 2011, the State charged defendant by information with six counts of first degree murder (720 ILCS 5/9-1(a)(1), (a)(2) (West 2010)), four counts of attempt (first degree murder) (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2010)), and two counts of aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2010)). The State's charges related to the April 30, 2011, shooting death of Devin Kirk, who was with his two friends, Jamel Jelks and Deontae Hodges, at the time of the shooting. Before trial and on the State's motion, the circuit court dismissed without prejudice three of the first degree murder counts, two of the attempt (first degree murder) counts, and both aggravated discharge of a firearm counts. On March 31, 2014, the court commenced a jury trial on the five remaining counts, three for first degree murder (counts I, II, and III) and two for attempt (first degree murder) (counts VII and VIII). At defendant's jury trial, the State presented the testimony of 27 witnesses, one of whom was recalled in rebuttal, and defense counsel presented 3 witnesses. Numerous exhibits were also admitted into evidence. We will only set forth the evidence necessary to address the issues on appeal.

¶ 6        Omar Matthews testified that, on the date of the shooting, he had resided for about six months with defendant and Tyler Madding at 980 West View Street in Decatur, Illinois.

- 2 -

Matthews was also friends with Eric Cunningham and knew the victim, Kirk, and his friends Jelks, Hodges, and Kanoski Powell. Matthews testified an ongoing argument existed between his friends and Jelks's friends. Before the shooting took place, Matthews was heading into the Van Dyke Store, a local grocery store, when Jelks was exiting with two friends. According to Matthews, he punched Jelks in the face without any provocation. Defendant was present when he punched Jelks. After leaving the store, Matthews went home to 980 West View Street. Matthews did not stay home long and left in a white convertible. When Matthews heard gunshots, he turned around and went to look for his friends. Matthews picked defendant up on View Street in front of a vacant lot. Defendant said, "They are shooting." Matthews estimated less than an hour passed between the incident at the Van Dyke Store and the gunshots. Matthews admitted not cooperating with the police in the beginning, which led to a charge of obstructing justice. Matthews pleaded guilty to that charge. He did not receive any promises from the State in exchange for his testimony in this case.

¶ 7     A surveillance video from the Van Dyke Store was played during Jelks's testimony. Jelks identified Matthews as the one who punched him and defendant as the person following Matthews. According to Jelks, a few punches were thrown after he was punched by Matthews. After that, Matthews, defendant, and Madding walked off toward View Street. Jelks then met up with Kirk and Hodges, and they walked into an alley near King Street. In the alley, Jelks saw defendant and Cunningham. Both defendant and Cunningham pulled out guns and started firing in Jelks's direction. Jelks testified Cunningham's gun was a .25- or .22-caliber weapon. Jelks testified he, Kirk, and Hodges were standing side by side when the gunfire started, and they all ran to different yards after the shots were fired. Jelks estimated seven shots were fired. Neither he nor his friends had guns that day. Additionally, Jelks admitted having a

burglary conviction and a pending armed violence charge. He testified the State had not made him any promises in exchange for his testimony.

¶ 8       Cunningham testified he received a call from defendant, who asked him to come over to defendant's home. He went over to defendant's home and took with him a .25-caliber gun, which had a two- or three-inch barrel. When he arrived, defendant told Cunningham about Matthews and Jelks's recent altercation. Cunningham left defendant's house and went for a haircut at his aunt's home, located at 988 West King Street and next to the alley where the shooting occurred. Defendant called again and said Jelks and Gerald Leggions were in the area. Cunningham left his aunt's home to meet defendant. He saw defendant coming toward him and to his right he saw Jelks, Hodges, and a third man walking toward him in the alley. The trio was "[a] couple houses away" from Cunningham. Cunningham shot his .25-caliber gun twice up in the air to scare the three away and did not intend to hit any of them. Thereafter, he saw defendant holding a .357-caliber revolver straight out and shooting at the three men. Cunningham heard the gun fire twice. Cunningham acknowledged that, in exchange for his testimony in this case, the State offered him a 20-year sentence (consecutive prison terms of 14 years for possession of a weapon by a felon and 6 years for obstructing justice) and dismissal of an unrelated aggravated discharge of a firearm charge.

¶ 9       James Killings testified he had a criminal record and had not received any promises regarding his pending theft case in exchange for his testimony. He testified he lived in the house next to defendant's home and had drunk a pint of Wild Rose on the morning of the shooting. After walking his dog, Killings stood in his doorway and saw a black man and a Chinese/Mexican man leave defendant's home and walk across the vacant lot and into the alley across from his home. Killings then observed the Chinese/Mexican man walk back into the

vacant lot at which time defendant left his front porch and met up with the Chinese/Mexican man in the empty lot. It appeared the Chinese/Mexican man passed something to defendant, but Killings did not see the item that was given to defendant. Defendant then walked to the alley that runs between View and King Streets. Due to the vacant lot, Killings could see defendant standing in the alley. Killings saw defendant shoot a gun down the alley toward Van Dyke Street. The black man, who had been with the Chinese/Mexican man, was also in the alley shooting. Killings could see the fire from the guns when they discharged and estimated he heard eight gunshots. Defendant then ran to View Street, where he shot his gun in the air. A white convertible came down View Street from the west, picked up defendant, and drove toward Van Dyke Street.

¶ 10         On cross-examination, Killings testified he drank a pint of Wild Rose every morning. He also drank alcohol the night before the shooting to the point of having a buzz. After the shootings, Killings drank wine, beer, and alcohol. He was "full," which he explained meant he was "drunk." Killings testified he went to the police station the night of the shootings and he was drunk at the time. The police asked him questions, but they could not understand his answers due to his intoxication. He was also unable to pick out the shooter that night. The police took him back home and came back the next day to speak with him. Killings again stated he did not know what was given to defendant by the other man when they were in the vacant lot. Killings admitted it could have been a package of cigarettes. Killings was also asked several questions about the distance between himself and defendant when Killings observed the exchange in the vacant lot.

¶ 11         Another neighbor, Anna Johnson, testified she lived at 968 West View Street and, on the day of the shooting, she was sitting in her car waiting on her sons. While she was waiting,

she observed a man, whom she later identified in a photographic lineup as defendant, leave the porch at 980 West View Street and go to the empty lot across the street. A couple of minutes later, she heard five gunshots. A couple of minutes after hearing the gunshots, she drove off from her house down West View Street and saw defendant with another man. They were walking away from the alley toward 980 West View Street. Defendant had a gun with a barrel of around 11 inches. Johnson observed defendant put the gun into his waistband.

¶ 12        On cross-examination, Johnson testified she spoke with the police the afternoon of the shooting. Before testifying, she had reviewed the statement she made to the police. The statement did not mention the individual put a gun into his waistband. Johnson also testified she never saw defendant fire a gun. She did hear gunshots two minutes after seeing defendant run across a field. Johnson further testified the person she picked out of the photographic lineup looked like the kid with the gun but, in the picture the police showed her, "his skin coloring was a little bit darker than the actual person I saw." Johnson acknowledged there was a difference in the photograph she identified and the person she saw on the day of the shooting.

¶ 13        Dr. Scott Denton, a forensic pathologist, testified the bullet removed from Kirk was consistent with a medium-caliber gun, such as .38 or .35. The bullet that caused the upper back injury exited the body in the neck region. Kirk's upper-back gunshot wound was not consistent with a .25-caliber bullet because such bullets make very small holes and usually do not exit the body. Moreover, Decatur police detective Joe Patton testified he attended Dr. Ralston's autopsy and took custody of the bullet removed from Kirk's body. Based on his training and experience, he estimated the bullet was .9mm to .38-caliber. The bullet was inconsistent with a .22- or a .25-caliber bullet because those types of bullets are much smaller than the one recovered from Kirk. Carolyn Kersting, a tool-mark examiner with the Illinois State

Police forensic science laboratory, testified the bullet from Kirk's body could have been shot from a .357-caliber revolver but not a .25-caliber firearm.

¶ 14        Defendant presented the testimony of Bobby Boehme and Leonquis Morris, who were both in jail with Cunningham. Both testified Cunningham talked about this case with them. Cunningham admitted to shooting Kirk and stated defendant had nothing to do with it.

¶ 15        The jury found defendant guilty of the first degree murder of Kirk and two counts of attempt (first degree murder) for Hodges and Jelks. The circuit court sentenced defendant to 46 years' imprisonment for first degree murder and to two concurrent prison terms of 26 years for attempt (first degree murder) to run consecutive to his first degree murder sentence. Defendant appealed and argued (1) the State's evidence was insufficient to prove him guilty beyond a reasonable doubt, (2) the trial judge made improper comments during defendant's trial, and (3) he was denied effective assistance of trial counsel. This court affirmed but declined to address defendant's claims of ineffective assistance of counsel due to an insufficient record. *People v. McSpadden*, 2015 IL App (4th) 140814-U. Defendant filed a petition for leave to appeal to the supreme court, which was denied. *People v. McSpadden*, No. 120004 (Ill. Jan. 20, 2016) (supervisory order).

¶ 16        In October 2016, defendant filed his original postconviction petition in which he asserted he was denied effective assistance of trial counsel because counsel (1) conceded defendant's guilt in both his opening statement and closing argument, (2) failed to competently cross-examine the State's witnesses, (3) behaved in the courtroom in a manner that required admonishments by the circuit court, and (4) failed to make an offer of proof to preserve the court's denial of the opportunity to recross-examine Officer Todd Cline. On January 13, 2017, the court entered an order advancing defendant's petition to the second stage of the proceedings.

At the second stage, the State filed a motion to dismiss defendant's postconviction petition, asserting defendant failed to make a substantial showing of ineffective assistance of counsel on all of his claims. In September 2017, defendant filed a supplemental/amended postconviction petition asserting his aggregate 72-year prison sentence was unconstitutional because it was a *de facto* life sentence and the court failed to take into account the considerations required by *Miller v. Alabama*, 567 U.S. 460, 483 (2012), and the "mandatory" firearm enhancement the court imposed was discretionary and not mandatory. The State then filed a motion to dismiss defendant's supplemental/amended postconviction petition, contending defendant had forfeited his issues by failing to raise them on direct appeal, defendant's sentence was not a *de facto* life sentence, and the firearm enhancements were mandatory as applied to defendant.

¶ 17　　　　　On March 21, 2018, the circuit court held a hearing on both of the State's motions to dismiss. The court granted the State's motion to dismiss the original postconviction petition, finding it was questionable whether defense counsel's performance fell below an objective standard of reasonableness but defendant was not prejudiced by counsel's representation. However, the court denied the State's motion to dismiss the supplemental/amended petition, and thus that petition moved to the third stage of the postconviction proceedings. At the July 24, 2018, third-stage hearing, the State conceded defendant's supplemental/amended petition, and the court then held a new sentencing hearing. Defendant presented the testimony of his mother, Debbie Benson. After hearing the parties' arguments, the court sentenced defendant to a prison term of 26 years for first degree murder and two concurrent prison terms of 9 years for the attempt (first degree murder) convictions to again run consecutive to the first degree murder sentence. That same day, the court entered an amended sentencing judgment.

¶ 18　　　　　On August 10, 2018, defendant filed a timely notice of appeal from the circuit

court's July 24, 2019, judgment in compliance with Illinois Supreme Court Rule 606 (eff. July 1, 2017). Accordingly, this court has jurisdiction of defendant's appeal from the dismissal of his original postconviction petition under Illinois Supreme Court Rule 651(a) (eff. July 1, 2017). See *McGath v. Price*, 342 Ill. App. 3d 19, 33, 793 N.E.2d 801, 812 (2003) (noting the reviewing court had jurisdiction of all prior unspecified orders which were steps in the procedural progression that led to the order specified in the notice of appeal).

¶ 19                                    II. ANALYSIS

¶ 20          The Postconviction Act provides a remedy for defendants who have suffered a substantial violation of constitutional rights at trial. *People v. Pendleton*, 223 Ill. 2d 458, 471, 861 N.E.2d 999, 1007 (2006). In cases not involving the death penalty, the Postconviction Act sets forth three stages of proceedings. *Pendleton*, 223 Ill. 2d at 471-72, 861 N.E.2d at 1007.

¶ 21          At the first stage, the circuit court independently reviews the defendant's postconviction petition and determines whether "the petition is frivolous or is patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2016). If it finds the petition is frivolous or patently without merit, the court must dismiss the petition. 725 ILCS 5/122-2.1(a)(2) (West 2016). If the court does not dismiss the petition, it proceeds to the second stage, where, if necessary, the court appoints the defendant counsel. *Pendleton*, 223 Ill. 2d at 472, 861 N.E.2d at 1007. Defense counsel may amend the defendant's petition to ensure his or her contentions are adequately presented. *Pendleton*, 223 Ill. 2d at 472, 861 N.E.2d at 1007. Also, at the second stage, the State may file a motion to dismiss the defendant's petition or an answer to it. *Pendleton*, 223 Ill. 2d at 472, 861 N.E.2d at 1008. If the State does not file a motion to dismiss or the court denies such a motion, the petition advances to the third stage, wherein the court holds a hearing at which the defendant may present evidence in support of his or her petition. *Pendleton*, 223 Ill. 2d at 472-

- 9 -

73, 861 N.E.2d at 1008. In this case, the State did file a motion to dismiss, and the court granted that motion.

¶ 22      With the second stage of the postconviction proceedings, the circuit court is concerned only with determining whether the petition's allegations sufficiently show a constitutional infirmity that would necessitate relief under the Postconviction Act. *People v. Coleman*, 183 Ill. 2d 366, 380, 701 N.E.2d 1063, 1071 (1998). At this stage, "the defendant bears the burden of making a substantial showing of a constitutional violation" and "all well-pleaded facts that are not positively rebutted by the trial record are to be taken as true." *Pendleton*, 223 Ill. 2d at 473, 861 N.E.2d at 1008. "[T]he 'substantial showing' of a constitutional violation that must be made at the second stage [citation] is a measure of the legal sufficiency of the petition's well-pled allegations of a constitutional violation, *which if proven* at an evidentiary hearing, would entitle petitioner to relief." (Emphasis in original.) *People v. Domagala*, 2013 IL 113688, ¶ 35, 987 N.E.2d 767. The court reviews the petition's factual sufficiency as well as its legal sufficiency considering the trial court record and applicable law. *People v. Alberts*, 383 Ill. App. 3d 374, 377, 890 N.E.2d 1208, 1212 (2008). However, at a dismissal hearing, the court is prohibited from engaging in any fact-finding. *Coleman*, 183 Ill. 2d at 380-81, 701 N.E.2d at 1071. Thus, the dismissal of a postconviction petition at the second stage is warranted only when the allegations in the petition, liberally construed in light of the trial record, fail to make a substantial showing of a constitutional violation. *Coleman*, 183 Ill. 2d at 382, 701 N.E.2d at 1072. We review *de novo* the circuit court's dismissal of a postconviction petition at the second stage. *Pendleton*, 223 Ill. 2d at 473, 861 N.E.2d at 1008.

¶ 23      This court analyzes ineffective assistance of counsel claims under the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Evans*, 186 Ill. 2d 83, 93, 708

N.E.2d 1158, 1163 (1999). To obtain reversal under *Strickland*, a defendant must prove (1) his counsel's performance failed to meet an objective standard of competence and (2) counsel's deficient performance resulted in prejudice to the defendant. *Evans*, 186 Ill. 2d at 93, 708 N.E.2d at 1163. To satisfy the deficiency prong of *Strickland*, the defendant must demonstrate counsel made errors so serious and counsel's performance was so deficient that counsel was not functioning as "counsel" guaranteed by the sixth amendment (U.S. Const., amend. VI). *Evans*, 186 Ill. 2d at 93, 708 N.E.2d at 1163. Further, the defendant must overcome the strong presumption the challenged action or inaction could have been the product of sound trial strategy. *Evans*, 186 Ill. 2d at 93, 708 N.E.2d at 1163. To satisfy the prejudice prong, the defendant must prove a reasonable probability exists that, but for counsel's unprofessional errors, the proceeding's result would have been different. *Evans*, 186 Ill. 2d at 93, 708 N.E.2d at 1163-64. The *Strickland* Court noted a case should be decided on the ground of lack of sufficient prejudice rather than counsel's constitutionally deficient representation if it is easier to do so. *Strickland*, 466 U.S. at 697.

¶ 24                          A. Concessions of Defendant's Guilt

¶ 25          Defendant first argues several statements defense counsel made in his opening statement and closing argument were concessions of defendant's guilt that deprived defendant of a fair trial. Defendant points to one comment in defense counsel's opening statement and three comments in his closing argument.

¶ 26                          1. *Opening Statement*

¶ 27          Defendant contends defense counsel conceded defendant's guilt during counsel's opening statements by stating "[A]nd '[t]he evidence will show that it was my client that killed him.' " The State argues defendant misquoted the record. We find a reading of the entire

paragraph in which the comment was made is warranted to fully understand the context of defense counsel's statement.

¶ 28      Defense counsel's comment at issue is contained in the following paragraph:

> "Things are rough, the situation is ruff [*sic*]. It's chaos. You have 5, 10, 15 people telling stories of what they saw or heard or what they thought they saw or heard. They will be subject to cross examination, what did you really see? How far away from it? And the conclusion being, I don't believe. Okay. The evidence will show that it was my client that killed him. That murdered him. I believe the evidence will show they don't know what bullet, whoever fired it, was the cause of death. Unless something's changed, it was never determined. And you will hear from the doctors what they saw."

In the above quote, defense counsel was stating what the State contended and then asserting he would refute that. When reading the paragraph in its entirety, defense counsel is clearly refuting the State's version of the facts and not conceding defendant's guilt. Moreover, the statement raised by defendant could be read as the following: "I don't believe, ok, the evidence will show that it was my client that killed him." Accordingly, we find defendant has failed to make a substantial showing of a deficient performance based on defense counsel's comment in his opening statement.

¶ 29                        2. *Closing Argument*

¶ 30      As to closing argument, the defendant contends defense counsel conceded (1) Johnson's identification of defendant, (2) defendant's guilt based on an accountability theory by stating Cunningham was the first shooter and defendant was the second, (3) defendant's guilt based on an accountability theory in his comments about the testimony of Cunningham's

cellmates. With regard to the comment about Johnson's identification, the State argues defense counsel did not concede Johnson positively identified defendant. With the second argument, the State contends, *inter alia*, defendant cannot make a substantial showing of prejudice because the jury found defendant personally discharged the firearm that killed the victim. Last, with the third argument, the State notes what one witness said or did not say to another witness is not an admission of guilt.

¶ 31 Defense counsel stated the following regarding Johnson's testimony: "The lady who saw, Okay. My client she said. She identified him. Forget the skin color. It's him. Let's make it him. We don't have to talk about dark, light." Defendant contends his counsel conceded Johnson, who was 100 to 500 yards away when she made her observations of defendant with a firearm, positively identified defendant. We agree with the State a review of defense counsel's entire argument indicates he was attempting to point out the weaknesses in Johnson's testimony apparently with sarcasm. Defense counsel goes onto point out Johnson did not tell the police about her observations in both her first and second meeting with them. He then argues "we don't have proof beyond a reasonable doubt here." Thus, we disagree with defendant his counsel conceded Johnson positively identified defendant. Accordingly, defendant failed to make a substantial showing of deficient performance on his claim related to Johnson.

¶ 32 As to defendant's claim related to accountability, we address that argument on the prejudice prong of the *Strickland* test. Contrary to the State's assertion, the jury only found defendant "personally discharged a firearm in committing First Degree Murder was proven." It did not find defendant's discharge of the firearm killed the victim. Regardless, on direct appeal, defendant challenged the sufficiency of the State's evidence as to his first degree murder conviction. *McSpadden*, 2015 IL App (4th) 140814-U, ¶ 22. This court concluded the State's

- 13 -

evidence was more than sufficient for the jury to find defendant was the one who fatally shot the victim, Kirk. *McSpadden*, 2015 IL App (4th) 140814-U, ¶ 29. We explained five witnesses saw defendant at the scene of the shooting or leaving the scene and four witnesses saw defendant with a gun. *McSpadden*, 2015 IL App (4th) 140814-U, ¶ 29. The evidence also showed the fatal shots could not have come from a .25-caliber weapon which Jelks stated the other shooter, Cunningham, possessed. *McSpadden*, 2015 IL App (4th) 140814-U, ¶ 29.

¶ 33    Thus, even if defense counsel conceded defendant's guilt on an accountability theory, the evidence was more than enough for the jury to find defendant was the actual shooter. Accordingly, defendant cannot make a substantial showing the proceeding's result would have been different but for counsel's concession defendant was guilty on an accountability theory.

¶ 34    The aforementioned reasoning also applies to defendant's claim defense counsel conceded defendant's guilt on accountability in commenting on the testimony of Cunningham's cellmates. Thus, defendant also failed to make a substantial showing of prejudice on the claim related to defense counsel's comments about Cunningham's cellmates.

¶ 35                    B. Cross-Examination of the State's Witnesses

¶ 36    Last, defendant argues defense counsel failed to "conduct competent cross examinations" of Johnson and Killings on each witness's ability and opportunity to observe defendant. The State contends defense counsel's cross-examination was a matter of trial strategy.

¶ 37    With ineffective assistance of counsel claims, a court accords much deference to defense "counsel's judgment and strongly presumes that counsel's conduct falls within the wide range of reasonable professional assistance." *People v. Richardson*, 189 Ill. 2d 401, 413, 727 N.E.2d 362, 370 (2000). "Generally, the decision whether or not to cross-examine or impeach a

witness is a matter of trial strategy which will not support a claim of ineffective assistance of counsel." *People v. Pecoraro*, 175 Ill. 2d 294, 326, 677 N.E.2d 875, 891 (1997). Our supreme court has explained "[t]he manner in which to cross-examine a particular witness involves the exercise of professional judgment which is entitled to substantial deference from a reviewing court." *Pecoraro*, 175 Ill. 2d at 326-27, 677 N.E.2d at 891. Accordingly, a "[d]efendant can only prevail on an ineffectiveness claim by showing that counsel's approach to cross-examination was objectively unreasonable." *Pecoraro*, 175 Ill. 2d at 327, 677 N.E.2d at 891.

¶ 38 Here, defendant notes defense counsel did not cross-examine Johnson about (1) any description of the man defendant was allegedly walking with, (2) the fact she was driving a vehicle with her family when she saw defendant purportedly put a gun in his waistband, and (3) her testimony defendant was 100 to 500 yards away. This is not a case where defense counsel completely failed to cross-examine Johnson. Defense counsel cross-examined Johnson about whether she informed the police on the day of the shooting about defendant putting the gun into his waistband and the fact she did not see defendant fire the gun. He also questioned her about the difference in the appearance of the man she saw and the photograph in the lineup. Thus, contrary to defendant's argument, defense counsel did cross-examine Johnson about her observation of defendant allegedly putting a gun into his waistband and her identification of defendant. Moreover, as the State argues, defense counsel's decision not to cross-examine Johnson about being 100 to 500 yards away from defendant could have been trial strategy as a question would have allowed Johnson to correct or clarify her testimony. Defendant's argument is basically a suggestion of how the cross-examination of Johnson might have been handled differently. Thus, we find defendant did not make a substantial showing defense counsel's approach fell outside the wide range of reasonable professional assistance.

¶ 39 As to Killings, defendant contends defense counsel failed to question him about whether (1) he considered himself an alcoholic, (2) he hallucinated when intoxicated, (3) intoxication affected his memory, and (4) he had been hospitalized for his illness. He claims defense counsel's cross-examination of Killings was shallow and incompetent. The State asserts defendant misrepresents the record because defense counsel thoroughly cross-examined Killings regarding his alcohol use in general and on the day of the murder. We agree with the State. Defense counsel cross-examined Killings about his alcohol consumption on the day of the murder, as well as the night before the murder, and his alcohol consumption in general. Killings admitted he was so intoxicated hours after the shootings the police could not understand what he was saying in response to their questions. Killings also acknowledged he could not identify anyone that night. Defense counsel also questioned Killings about how familiar he was with defendant and how far away he was from defendant when he saw a man hand something to defendant in the vacant lot. Moreover, defense counsel cross-examined Killings about his lack of knowledge about what was supposedly transferred between defendant and another man in the vacant lot. On cross-examination, Killings admitted he did not know what or who defendant and the other man were shooting at. Again, with Killings, defendant's argument basically is defense counsel could have handled the cross-examination differently. Thus, defendant also did not make a substantial showing defense counsel's approach fell outside the wide range of reasonable professional assistance.

¶ 40 Since defendant has failed to make a substantial showing on all of his claims of ineffective assistance of counsel, dismissal of his original postconviction petition was proper.

¶ 41 III. CONCLUSION

¶ 42 For the reasons stated, we affirm the Macon County circuit court's judgment.

- 16 -

¶ 43         Affirmed.