2021 IL App (1st) 181102-U
No. 1-18-1102
Order filed June 30, 2021

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 90 CR 13367 |
| | ) | |
| DAVID DELGADO, | ) | Honorable |
| | ) | Nicholas Ford, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE HYMAN delivered the judgment of the court.
Justices Pierce and Coghlan concurred in the judgment.

**ORDER**

¶ 1    *Held*:    Summary dismissal of defendant's postconviction petition affirmed where actual innocence claim barred by *res judicata* as further advocacy of Delgado's strategy of self-defense, which the appellate court rejected on direct appeal; even if not barred, the claim is meritless because the newly discovered affiant's proposed testimony was cumulative to the trial testimony and the defense witnesses' testimony. The ineffectiveness claim was meritless where trial counsel failed to impeach one of the defense witnesses with prior statement to police.

¶ 2    Delgado appeals from the trial court's summary dismissal of his petition for post-

conviction relief. The postconviction petition claimed actual innocence based on newly discovered

evidence in affidavits from two inmates at Pontiac prison, Eladio Gomez and Marcos Alcantar. They both stated they saw the shooting for which Delgado was convicted, including three men attacking Delgado, who then retrieved a gun and shot two of the men. Alcantar's affidavit added that the police shot at Delgado three times and Delgado was unarmed.

¶ 3    Delgado asserts (i) an actual innocence claim based on Alcantar's affidavit, and (ii) an ineffective assistance claim based on trial counsel's failure to use available impeaching evidence to discredit one of the State's eyewitnesses.

¶ 4    We affirm. Alcantar's affidavit contained assertions heard at trial from other witnesses. Although a "new" witness in that he had not testified at trial, the evidence Alcantar attested to was not new or cumulative, and unlikely to result in a different outcome. In addition, the ineffective assistance of counsel claim is unfounded. The "impeachment" evidence Delgado proffers contains an insignificant discrepancy between one witness's statement to the police that differed from his trial testimony.

¶ 5                                  Background

¶ 6    On November 6, 2019, the Illinois Supreme Court issued a supervisory order directing this Court "to treat the notice of appeal filed on April 23, 2018, and assigned case No. 1-18-1102, as a properly perfected appeal from the trial court's March 27, 2018, judgment summarily dismissing Delgado's post-conviction petition and the circuit court's June 7, 2018, judgment denying his motion for reconsideration."

¶ 7                                  *Trial*

¶ 8    Delgado was charged with first degree murder of Daniel Ramos, first degree murder of Jose Macias, and two counts of attempted murder of Chicago police officers Mark Severino and

Paul Venticinque stemming from a shooting on May 7, 1990, outside a Chicago tavern. After a bench trial, Delgado was convicted of two counts of first degree murder and two counts of attempted murder.

¶ 9     At trial, Venticinque testified that about 4:00 a.m. on May 7, 1990, he and his partner (Severino) were patrolling in a marked police car. As they drove eastbound on Fullerton, Venticinque saw a crowd of 15 to 20 people leaving a tavern on West Fullerton. They slowed down and Venticinque saw people running and leaning over, "trying to get cover for some reason." Venticinque then saw Delgado facing another man near the door of the tavern. The other man was unarmed. The man moved his hands towards his face, with his palms out, and Venticinque saw Delgado point a gun at him. He heard two shots. and the man fell to the sidewalk. Venticinque never saw the unarmed man strike or make threatening motions towards Delgado.

¶ 10    Another man came running towards the police car, and Venticinque motioned for him to get down. Delgado then turned toward the officers and waved his gun at them. At that point, Severino was getting out of the police car, and Venticinque yelled, "Get down. He's going to shoot." Other people were running between cars to get away. Venticinque heard a third shot that appeared to have been fired in his direction and saw the second man, who was running towards the officers, fall, disappearing from his sight. Venticinque fired one shot toward Delgado, and Delgado turned and ran. Severino chased Delgado on foot; Venticinque called for assistance as he drove toward Delgado.

¶ 11    Venticinque heard another shot fired as he turned the corner. When he got to the mouth of the alley, he stopped and parked. Delgado moved a dumpster and crouched between the dumpster and the building in an "aiming" position. Delgado's hand "protrude[ed]" from behind the

dumpster, and Venticinque "realized he's going to fire." He yelled to Severino to get back. Instead, Severino fired his at Delgado, who dove under nearby boxes. As Venticinque approached on foot, Delgado lay face-down and motionless, with his hands beneath his body. Venticinque turned Delgado over. Suddenly, Delgado "opened his eyes and took a swing" at Venticinque. After a short scuffle, Venticinque and two other officers arrested Delgado.

¶ 12    In his testimony, Severino said he heard a shot fired but did not see Delgado shoot. He fired once at Delgado as he reached the corner and again at the mouth of the alley. Severino estimated the entire encounter lasted three minutes.

¶ 13    Chicago police officer Richard Tufano testified that he responded to the radio call for help. When he arrived at the alley, he saw Delgado lying face down. Delgado sat up and began to struggle with Venticinque. After Delgado's arrest, Tufano went to the tavern where one man was lying on the sidewalk in front of the tavern and another man lying in the street. He recovered a gun on the sidewalk next door. But, no gun was ever found in the alley.

¶ 14    Jose Diaz and Valentin Padilla testified as eyewitnesses.

¶ 15    On the night of the shooting, Jose Diaz was at the tavern with Padilla and Hector Bira. Diaz left the tavern when it closed. He admitted he "was a little bit drunk," having consumed 15-16 beers over seven hours. A group of people was in front of the tavern. Diaz got into a fight with another man from his hometown in Mexico. When the fight ended, Diaz heard shots and saw Delgado running away with a gun in his hand. He told police he saw Delgado shoot two people. Diaz did not know Delgado but had seen him before that night.

¶ 16    Padilla testified that he left the tavern with Diaz. Ten or twelve people were outside as he walked to his car nearby. A man with a gun was leaning against the front of the tavern, and Padilla

saw another man push him. The armed man shot the man who was pushing him and a second man who was walking away. Padilla heard two shots and then saw the armed man wave the gun overhead, drop it, and run with the police chasing him. Padilla could not identify the armed man. Padilla had consumed 6-8 beers.

¶ 17    Finally, two witnesses who lived across the street from the tavern testified. Margaret Skrodzka testified the sound of two gun shots woke her, and she ran to her bedroom window that faced the street. People were standing in front of the tavern, and she saw someone fall near the curb. A man, whom Skrodzka identified in court as Delgado, ran towards the corner. A police car drove towards him, and when the squad car's door opened, Delgado turned toward the officers with his arm outstretched. Skrodzka was unsure if she saw anything in Delgado's hand. A police officer then chased Delgado on foot, and she heard another gunshot.

¶ 18    Kurzac testified he was awake before the shooting, having recently arrived home from work. He looked out a window and saw 15 people leaving the tavern and five people standing in front. While he did not see a fistfight, he did see Delgado fire three shots and a man fall onto the sidewalk near the tavern. Delgado then ran and the police chased him. Police fired one shot at him; Kurzac later heard a second shot. He identified Delgado from a line up. On cross-examination, Kurzac said he saw 20 to 30 people in front of the tavern.

¶ 19                                    *Defense Witnesses*

¶ 20    Casimir Gomez testified that he had known Delgado for three years and had seen him about six months before his trial testimony. On the night of the shooting, Gomez went to the tavern with his father. They left at closing and walked toward Gomez's car parked about 75 feet away. Gomez looked back and saw Delgado leave. Gomez saw two men "attack" Delgado. Five other people

were standing in front of the tavern. Gomez watched the fight for two minutes as Delgado fought back. Gomez drove away and heard four gunshots from a block away.

¶ 21    Segundo Cazares knew Delgado from playing pool and had known Gomez for about four years. Cazares, together with his father, were among the last people to leave the tavern. After about six beers, he was "halfway drunk" when he left. He saw Delgado on the ground about 30 feet away, with two men hitting him. Cazares heard something metal hit the ground. Cazares did not see a gun in Delgado's hands but saw him "defending himself going upward with his hands." Cazares left and never looked back. As he reached his parked car, he heard gunshots.

¶ 22    Delgado testified on his own behalf. He arrived at the tavern between 12:30 and 1:00 a.m. and stayed until closing. "[A] lot of people" left at closing time, and he was in the middle of the group. When outside, he saw two people fighting and stopped to see if he recognized anyone. Someone grabbed his neck from behind and knocked him down, while a second person grabbed chains around his neck. Delgado grabbed the hand that held his chain and "took [the person] down with" him.

¶ 23    Three unknown Hispanic men, whose physical characteristics he could not remember, hit and kicked him. Delgado defended himself with his hands and feet while on the ground. A gun "fell" from one of the men; Delgado picked up the gun and began to shoot because "they were on top of me." Delgado could not recall what position he was in when he was shooting or how many times he fired. Once the "attack" ended, he ran and threw the gun down along the way. He denied seeing the police before he began running and denied firing at officers.

¶ 24    While running, Delgado heard more gunshots and thought the same people who had attacked him were shooting at him. He denied turning and extending his arm and stated, "I have

never used a weapon." He hid between a wall and "a garbage can" in an alley, face-down, with his hands on top of himself to cover him.

¶ 25    The police arrived 10 to 15 minutes later and handcuffed him. He denied ever "lunging" at an officer. He did not remember what happened after he was handcuffed and stated that when he "woke up," he was in the police station, being interviewed. He was not "feeling well" and did not tell detectives that some men grabbed his chains. He was "scared" and "conscious about what they were telling me at the time."

¶ 26    During cross-examination, Delgado claimed that he was unconscious after being hit on the back of his head while being arrested. He knew he was at the police station because two men were shot. He did not tell detectives that he shot the gun to protect or defend himself; he "felt nervous" and "didn't feel like speaking to them" about his "personal problem." Two men were fighting when he left the tavern, and seven or eight people were standing around them. Delgado exchanged no words with the three men who allegedly attacked him.

¶ 27    After Delgado grabbed the gun that one of his attackers dropped, he turned around, looked up, and began to shoot. He "could have" fired the gun three times. When he began shooting, his attackers began to "walk backwards" because "they were frightened." When questioned how Macias was shot in the back, Delgado stated, "I don't know exactly how this happened during the fight we had because they were on top of me trying to take the gun from me." When asked if he was standing or on the ground when shooting, Delgado responded, "I don't recall exactly at that time. Because it was—I was shocked what was happening to me."

¶ 28    The trial court admitted Virginia Lopez's testimony from Delgado's bond reduction hearing as she was unavailable to testify at trial. Lopez said she was a prostitute and cocaine addict

and had been arrested three times for prostitution and drugs. That night, she was at the tavern and saw Delgado with money, buying people drinks, and wearing lots of jewelry. Macias, whom she had dated in the past, approached her and suggested she set up Delgado to be robbed. Lopez refused and left with her mother. They were sitting in a restaurant across the street when the tavern closed. Lopez saw "about two or three guys" run toward Delgado after he left the tavern. Two of them, Macias and Velarde, grabbed Delgado from behind, and a struggle followed. While they struck Delgado, something fell to the ground, which Delgado picked up. She then heard gunshots. She did not tell the police what she saw. Ten days before her testimony, she had contacted Delgado's attorney, after hearing a friend of her mother's talk about the shooting.

¶ 29    The trial court found Delgado guilty of two counts of first degree murder and two counts of attempted murder. The trial court sentenced Delgado to concurrent terms of life imprisonment for the murder conviction and 15 years each for the attempted murder convictions.

¶ 30                                    *Direct Appeal*

¶ 31    On direct appeal, Delgado claimed that: (1) he was not proven guilty beyond a reasonable doubt of the attempted murder convictions; and (2) he was acting in self-defense. On September 9, 1992, this Court affirmed Delgado's conviction and sentence. *People v. Delgado*, 1-91-1267 (1992) (unpublished order under Supreme Court Rule 23). The appellate court found Delgado's use of deadly force unnecessary and not justified as self-defense. And it held the evidence overwhelmingly supported conviction on the two counts of attempted murder of police officers.

¶ 32                                    *Postconviction*

¶ 33    Private counsel signed and filed Delgado's postconviction petition raising 27 claims of error, including an actual innocence claim based on Alcantar's affidavit. Another claim of error

was ineffective assistance of trial counsel claim for failure to impeach Kurzac, one of the State's main eyewitnesses, with his prior inconsistent statements. The trial court summarily dismissed the petition as frivolous and patently without merit and denied Delgado's motion to reconsider the summary dismissal.

¶ 34    Pertinent to this appeal, Alcantar's affidavit, dated February 23, 1994, stated:

"1) I was outside of the Club Verde, in the city of Chicago, Illinois.

2) I observed three (3) individuals attact [*sic*] Mr. David Delgado, whereupon he retrieved a handgun and shot the two (2) of Three (3) individuals whereupon the other individual ran.

3) Mr. David Delgado, droped [*sic*] the weapon and ran.

There were Chicago Police Officers who arrived on the scene and shot Mr. David Delgado approximately Three (3) times, while he was unarmed at the time he was shot by the Chicago police."

¶ 35    The second claim of error was ineffectiveness of trial counsel for failing to interview Kurzac before trial and failing to impeach his trial testimony with earlier statements to police. Delgado acknowledged that his trial counsel received Kurzac's statements in discovery. Yet, he asserted that the statements were "favorable to the self-defense theory because on [*sic*] his original statement Kurzac stated that he saw approximately 20-30 people involved in a fistfight in front of Club Verde and that the fight lasted approximately 5 to 10 minutes." At trial, Kurzac testified that he saw 15 people leaving the tavern and five people standing in front. Kurzac saw Delgado and victims "pulling" at each other, and denied seeing a fistfight.

¶ 36    In support of the ineffective assistance of trial counsel claim, Delgado attached a general

progress report, authored by Detective Dickinson, regarding his May 7, 1990, interview with

Kurzac. Detective Dickinson's handwritten notes, contained in the GPR, on Kurzac's interview,

stated:

> "Looking out window. Saw fistfight in front of bar. Saw off. involved in
> fight. 20-30 people. Bar was closed. 5-10 minutes[.] Heard 3 shots[.] Saw
> police pull up right away. Saw Police shoot 1 time at Spaulding &
> Fullerton [.] Think Police shot 2 times [.] Heard total of about 5 shots [.]"
> (C. 243)

Delgado also attached a portion of a typed police report on Kurzac's interview that stated :

> "[Kurzac] said that he had been at his residence and that he awoke during
> the middle of the night, approx. 0330-0400hrs. He was then sitting and
> looking out of his front window when he observed people exiting the Club
> Verde Lounge. He then observed what appeared to be a fistfight in front of
> the bar involving male Hispanic subjects. He believed that there were
> approximately 20 to 30 people in front of the bar. He observed this
> disturbance for approximately 5 to 10 minutes, at which time he heard what
> he believed to be 3 gunshots. During the time he heard the gunshots he did
> not see who was doing the shooting. At that same time he observed a
> marked Chicago Police vehicle pull up toward the curb and double park in
> the street. He then observed one of the police officers chasing the subject
> listed in custody. He observed them run eastbound on Fullerton toward
> Spaulding and then southbound on Spaulding from Fullerton. He observes
> the officer fire one shot southbound down Spaulding from Fullerton. The
> officer continued to chase the subject in custody southbound on Spaulding
> from Fullerton. He then observes the other police officer in the marked
> police vehicle then turn and proceed southbound on Spaulding from
> Fullerton. He then hears another shot shortly after observing the subject in
> custody and the police officers go southbound on Spaulding. He further
> stated that he believed that from the time this incident commenced he heard
> what he believed to be a total of 5 gunshots. He further added that when he
> first observed the officer chase the subject listed in custody, he did observe
> that the subject in custody did have a gun in his hand. When both the
> subject in custody and the officer turned and proceeded southbound on
> Spaulding he observed a gun lying on the sidewalk approximately 3 doors
> east of where this incident occurred. The above listed subject subsequently
> viewed a line up in Area 5 at which time he positively [identified] the
> subject listed in custody as the person that he observed running from the

> police with a gun in his hand. The results of the lineup are contained in an additional supplemental report."

¶ 37 The trial court summarily dismissed Delgado's petition for postconviction relief, stating:

> "Petitioner claims he is actually innocent based on newly discovered [*sic*] in the form of affidavits from Eladio Gomez and Marcos Alcantar. Gomez avers that he was at Club Verde the night of the shooting and saw petitioner being attacked and beaten by three men outside the bar. He saw petitioner retrieve a gun and shoot two of the three men. Alcantar avers to the same as Gomez but adds that the police shot three times at Delgado, who was unarmed."

> * * *

> Even if it is not barred, petitioner's claim is meritless. The potential testimony of Gomez and Alcantar is cumulative to the testimony of several witnesses at trial—including Casamir Gomez, Segundo Cazarez, Virginia Lopez, and petitioner—who testified that they saw three people attacking petitioner before he fired a weapon at them."

¶ 38 The trial court found the claim one of self-defense, the same as advanced and decided on direct appeal, and barred by the doctrine of *res judicata*. Moreover, even if not barred, the trial court found Delgado's claim meritless. The testimony of affiants was cumulative and "not of such a conclusive nature that the result on retrial would have been different."

¶ 39 Regarding the ineffectiveness of counsel claim, the trial court ruled: "Petitioner contends that trial counsel rendered ineffective assistance by failing to interview Lester Kurzac prior to trial. He claims that his trial testimony about 15 to 30 people being outside the bar at closing time was more favorable to Delgado than his pretrial statement that 20 to 30 people were outside. This claim is meritless. The difference of five people from pretrial to trial testimony is not significant,

especially here where the trier of fact heard that 30 people were outside the bar at trial, which is consistent with the pretrial statement. Therefore, this claim is frivolous and patently without merit."

¶ 40                                    Analysis

¶ 41                              *Standard of Review*

¶ 42    We review the trial court's summary dismissal *de novo* because the sufficiency of the allegations contained in a postconviction petition presents a legal question. *People v. Sanders*, 2016 IL 118123, ¶ 31. We review the judgment, not the reasons given for the judgment (*People v. Lee*, 344 Ill. App. 3d 851, 853 (2003)), and may affirm on any basis supported by the record. *People v. Jones*, 399 Ill. App. 3d 341. 350 (2010).

¶ 43                          *Post-conviction Proceedings*

¶ 44    The Post-Conviction Hearing Act, 725 ILCS 5/122-1 et seq. (2018), provides a three-step process for a defendant to seek to prove that his constitutional rights were violated at the proceedings which resulted in his conviction. *People v. English*, 2013 IL 112890, ¶ 23. The trial court may summarily dismiss a first stage postconviction petition only if the petition "has no arguable basis either in law or in fact." *People v. Tate*, 2012 IL 112214, ¶ 9. A petition lacks an arguable basis when "based on an indisputably meritless legal theory or a fanciful factual allegation." *Id*. at 16. At this stage, all well-pleaded allegations in the petition and supporting affidavits not positively rebutted by the trial record are to be taken as true. *People v. Robinson*, 2020 IL 123849. ¶ 39. The court must determine whether the petition's allegations sufficiently demonstrate a constitutional infirmity that would merit postconviction relief. *People v. Sparks*,

383 Ill. App. 3d 878, 883 (2009). Fact findings and credibility determinations are not made at the summary dismissal stage. *People v. Coleman*, 183 Ill. 2d 366, 391 (1998).

¶ 45    A proceeding under the Act constitutes neither a continuation nor substitute for direct appeal; rather, it is a collateral proceeding. *People v. Petrenko*, 237 Ill. 2d 490, 499 (2010). The proceeding allows inquiry into constitutional issues involved in the original conviction and sentence that have not and could not have been adjudicated on direct appeal. *People v. Harris,* 224 Ill. 2d 115, 124-25 (2007); *People v. Jones*, 211 Ill. 2d 140, 144 (2004) (quoting *People v. McNeil*, 194 Ill. 2d 134, 140) (*Res judicata* and waiver doctrine limit postconviction relief to matters which have not been and could have not been, adjudicated earlier). In the post-conviction petition, the petitioner has the burden to show a violation of his or her constitutional rights. *People v. Edwards*, 197 Ill. 2d 239, 244 (2001). If defendant fails, the petition is summarily dismissed. 725 ILCS 5/122-2.1.

¶ 46    Through private counsel, Delgado filed his post-conviction petition. The petition raised 28 claims which fell into five categories of error: (i) actual innocence; (ii) ineffective assistance of counsel; (iii) trial court error; (iv) violation of *Brady v. Maryland*, 373 U.S. 83 (1963); and (v) indictment based on false testimony. In this appeal, Delgado argues the trial court erroneously dismissed both the actual innocence claim and the ineffective assistance of trial counsel claim because counsel failed to use available impeaching evidence to discredit Kurzak.

¶ 47                                    *Actual Innocence*

¶ 48    We turn to Delgado's contention that his "post-conviction petition presented an arguable claim of actual innocence." Delgado presents an affidavit of a "newly discovered eyewitness" who attested that Delgado acted in self-defense when he shot at the two victims. And that Delgado did

not possess or fire a gun at police officers. Delgado asserts this testimony "would negate the inference that Delgado intended to kill the officers." Delgado argues Alcantar's affidavit constitutes newly discovered, material, and non-cumulative evidence and is likely to change the result on retrial.

¶ 49    The State maintains that the petition was "frivolous and patently without merit." Specifically, as to Delgado's actual innocence claim, the State argues Alcantar's affidavit is not new or cumulative and would not change the trial's outcome.

¶ 50    Alcantar's affidavit asserted that he was outside the tavern on the night of the shooting, and saw three people attack Delgado, who retrieved a handgun and fired at two attackers, dropped the gun, and ran. Alcantar further asserted that police officers fired three gunshots at an unarmed Delgado.

¶ 51    To establish a claim of actual innocence, Delgado must show the evidence is: (i) newly discovered after trial; (ii) could not have been discovered earlier through due diligence; (iii) material and not merely cumulative; and (iv) of such a conclusive character that it would probably change the result on retrial. *People v. Robinson*, 2020 IL 123849, ¶ 47. Material evidence means "relevant and probative of the petitioner's innocence" (*People v. Coleman*, 2013 IL 113307, ¶ 96); non-cumulative evidence adds to the information that the fact-finder heard at trial. *People v Molstad*, 101 Ill. 2d 128, 135 (1984).

¶ 52    The critical element of an actual innocence claim is the conclusiveness of the new evidence—evidence that, when considered along with the trial evidence, would probably lead to a different result. *Robinson*, 2020 IL 123849, ¶ 47 (first stage dismissal of successive postconviction petition reversed; new evidence of actual innocence need not be dispositive ). "Probability, rather

- 14 -

than certainty, is the key in considering whether the fact-finder would reach a different result after considering the prior evidence along with the new evidence." *Id*. ¶ 48.

¶ 53    Delgado argues Alcantar's testimony should be considered newly discovered—there was no reference in discovery to Alcantar and no indication the police interviewed him. *See People v. Munoz*, 406 Ill. App. 3d 844, 855 (2010) (occurrence witness who provided an affidavit attached to defendant's post-conviction petition and who was not disclosed in discovery tended to show the witness as newly discovered). Alcantar's affidavit was dated February 23, 1994, almost three years after Delgado's trial. Despite the lengthy and unexplained delay in bringing forth this affidavit, we will accept it as "newly discovered" posttrial.

¶ 54                                    *Material*

¶ 55    Material evidence is probative of a question before the trier of fact. *People v. Favors*, 254 Ill. App. 3d 876, 888 (1993). In other words, the evidence tends to prove or disprove a matter at issue. *Id*. The "new evidence" must "place the trial evidence in a different light and undermine the court's confidence in the judgment of guilt"; it may support a showing of actual innocence even where it conflicts with the trial evidence. *Robinson*, 2020 IL 123849, ¶ 48. But, this newly discovered evidence virtually duplicates the evidence at trial presented in the testimony of several persons who had been inside the tavern and came outside at closing just as the fight began.

¶ 56    Gomez and Cezares testified they saw a fight, heard shots, and saw two of the men fighting go down and one man run. Diaz identified Delgado as the man who ran. Padilla's ability to recall the events leading up to the shooting was "diminished" due to his alcohol intake; however, his testimony aligned with the other witnesses' accounts. Skrodzka and Kurzac saw the altercation

from their apartment window, and, after hearing shots, both saw Delgado run away. The officers who arrived as the shots were fired saw Delgado shoot.

¶ 57    Alcantar's affidavit stated he saw three "individuals" attack Delgado outside the tavern; Delgado "retrieved" a handgun, and shot two of them and the third ran away; then Delgado dropped the gun and ran. According to Alcantar, police shot at an unarmed Delgado three times.

¶ 58    Delgado argues that "Kurzac did not testify if Delgado had dropped the gun before the police fired at him" and that Padilla's powers of observation were diminished by his alcohol consumption. But the State presented multiple eyewitnesses who testified to essentially the same facts. After the tavern closed, several people were in front when a fight broke out. Some of the witnesses saw Delgado shoot a gun—where he got the gun is irrelevant. After shooting the two men, Delgado ran, police officers caught up to him, a struggle ensued, and Delgado was arrested. Two police officers testified that Delgado shot at them as he ran.

¶ 59    Delgado further argues that he shot in self-defense, and Alcantar's proposed testimony "regarding the details of the fight" would have provided context to decide the issue. This argument ignores this court's decision on direct appeal that Delgado's use of deadly force was unnecessary, and he did not act in self-defense. *Delgado*, 1-91-1267 (1992) (unpublished order under Supreme Court Rule 23). Even taking the allegations in the affidavit as true, the affidavit is cumulative and not so conclusive that a retrial would probably result in an acquittal.

¶ 60                    *Ineffectiveness of Trial Counsel*

¶ 61    Next, Delgado argues his "post-conviction petition has raised an arguable claim that his trial counsel was ineffective for failing to investigate and present an available police report to impeach Lester Kurzac with a prior inconsistent statement that he saw Delgado engaged in a

fistfight outside of Club Verde minutes before the shooting." The State responds that Delgado failed to establish that "he was arguably prejudiced by his trial counsel's alleged deficient performance."

¶ 62    Under the test announced in *Strickland v. Washington*, 466 U.S. 668 (1984), to succeed on a claim of ineffective assistance, Delgado must show that counsel's representation fell below an objective standard of reasonableness and, but for the deficient representation, the outcome of the proceeding would have been different. See also *People v. Smith*, 2014 IL 115946, 34.

¶ 63    Delgado asserted that if his trial attorney had conducted such an investigation, he would have discovered that Kurzac told officers that he saw Delgado engaged in a fistfight in front of the tavern, the fight lasted five to 10 minutes, and three gunshots were fired shortly after the fight ended. In support of his claim, Delgado attached two reports from Detective Dickinson memorializing Kurzac's statements. And, when assessing the importance of the failure to impeach for purposes of a *Strickland* claim, the "value of the potentially impeaching material must be placed in perspective." *People v. Jimerson*, 127 Ill. 2d 12, 33 (1989). Kurzac was not the State's main witness, and the record does not suggest a probability of a different outcome had trial counsel cross-examined him on his statements.

¶ 64    "The manner in which to cross-examine a particular witness involves the exercise of professional judgment which is entitled to substantial deference from a reviewing court." *People v. Pecoraro*, 175 Ill. 2d 294, 326-327 (1997). The only way for defendant to prevail on his ineffectiveness of counsel claim is by "showing that counsel's approach to cross-examination was objectively unreasonable." *Id*. at 327. Delgado takes exception to Kurzac's testimony that he saw the men outside the restaurant "pushing and pulling" at each other, after he told the police he saw

a fistfight going on. Delgado argues the "additional details" contained in the police reports would have bolstered Delgado's claim of self-defense.

¶ 65     But, again, on direct appeal, this court rejected the self-defense argument. The trial court heard the State's witnesses, which included various perspectives of the activities outside the tavern. In a bench trial, we presume the trial court knows the law and applies it properly (*People v Howery*, 17 Ill. 2d 1, 32 (1997)), and we presume that the trial court considered only competent evidence. *People v Naylor*, 229 Ill. 2d 584, 603 (2008).

¶ 66     Finally, the proper test at the first stage is whether it is arguable that counsel's performance fell below an objective standard of reasonableness and whether the defendant was arguably prejudiced. *Tate*, 2012 IL 112214, ¶ *22*. Delgado was afforded an adequate opportunity to present his legal theory with sufficient detail for this court's review. Even had trial counsel's performance been deficient, Delgado fails to show he suffered prejudice.

¶ 67     Affirmed.